

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| DON FEYLER, Derivatively On Behalf of US UNWIRED, INC., | ) ) | Case No. |
| | ) | **04-2436** |
| Plaintiff, | ) ) | **SECT T MAG. 2** |
| | ) | VERIFIED SHAREHOLDER |
| vs. | ) ) | DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS |
| ROBERT W. PIPER, WILLIAM L. HENNING, JR., JERRY E. VAUGHN, THOMAS G. HENNING, LAWRENCE C. TUCKER, HENRY P. HEBERT, JR., THOMAS J. SULLIVAN, CHRISTOPHER J. STADLER, CHARLES T. CANNADA, ANDREW C. COWEN, HARLEY RUPPERT, WILLIAM L. HENNING AND JOHN A. HENNING, | ) ) ) ) ) ) ) ) ) ) ) ) | MISMANAGEMENT, WASTE OF CORPORATE ASSETS AND UNJUST ENRICHMENT |
| Defendants, | ) ) | |
| - and - | ) ) | |
| US UNWIRED INC., a Louisiana corporation, | ) ) | |
| Nominal Defendant. | ) | |
| | ) | DEMAND FOR JURY TRIAL |

Plaintiff, by his attorneys, submits this Verified Shareholder Derivative Complaint (the "Complaint") against the defendants named herein.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought by a shareholder of US Unwired Inc. ("US Unwired" or the "Company"), on behalf of the Company against certain of its officers and directors seeking to remedy defendants' violations of state law, including breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment that occurred between May 23, 2000 and August 13, 2002 (the "Relevant Period") and that have caused substantial losses to US Unwired and other damages, such as to its reputation and goodwill.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332(a)(2), because complete diversity exists between the plaintiff and each defendant, and the amount in controversy exceeds $75,000.  This action is not a collusive one designed to confer jurisdiction on a court of the United States that it would not otherwise have.

3.      This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with Louisiana so as to render the exercise of jurisdiction by the Louisiana courts permissible under traditional notions of fair play and substantial justice.

4.      Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because one or more of the defendants either resides in or maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to US Unwired occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## SUMMARY OF THE ACTION

5.     This is a shareholder's derivative action on behalf of nominal defendant US Unwired against its entire Board of Directors and certain of its officers for breach of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment. Plaintiff contends that defendants have seriously undermined US Unwired's valuable reputation by systematically causing and/or permitting the Company to release a series of false and misleading statements and omissions of material fact. US Unwired's increasing revenues and profits from 2000 through 2002 were not the result of increased Personal Communication Service ("PCS") subscribers, but rather the result of a scheme to artificially inflate the price of shares of US Unwired common stock. US Unwired's involvement in these transactions has caused it to be sued for potentially millions of dollars in shareholder class action lawsuits.

6.     Defendants have deliberately, repeatedly and systematically failed to exercise independent or effective judgment and oversight of US Unwired's business and executives. Defendants participated in and/or approved of the conduct complained of herein to obtain the financial and social benefits of such positions for themselves, to enrich and further the personal and business interests of all defendants identified herein, and to allow many of the defendants to maintain their positions of control at US Unwired so that they would not be sued for their wrongdoing.

7.     All of these practices were designed and approved by US Unwired's senior management, including defendants named herein, to unlawfully maximize US Unwired's short-term revenues at the expense of US Unwired's long term value and US Unwired's shareholders.

8.     The Company may still be exposed to millions of dollars in civil damages from other outstanding litigation against the Company as a result of defendants' conduct. As a result of defendants' wrongful acts, US Unwired has already lost a significant amount of its value and the Company has suffered and will continue to suffer severe damage to its reputation, goodwill, and its ability to conduct future operations.

## THE PARTIES

9.     Plaintiff Don Feyler is, and was at times relevant hereto, an owner and holder of US Unwired common stock. Plaintiff is a citizen of Massachusettes.

- 2 -

10.     Nominal defendant US Unwired is a corporation organized and existing under the laws of the state of Louisiana with its headquarters located at 901 Lakeshore Drive, Lake Charles, Louisiana. US Unwired is a network partner of Sprint with the exclusive right to provide PCS services under the Sprint and Sprint PCS brand names in all or portions of 14 states with a population of approximately 17.6 million residents. US Unwired is one of the largest PCS Affiliates of Sprint and services over 500,000 customers.

11.     Defendant Robert W. Piper ("Piper") has been President of the Company since 1995, and was named Chief Executive Officer ("CEO") of US Unwired in 2000. Piper has been a director of US Unwired at all times relevant hereto. Because of Piper's positions, he knew the adverse non-public information about the business of US Unwired, specifically that the increased subscriptions for PCS service that the Company reported throughout the Relevant Period were experiencing high involuntary disconnection rates. This was due in part to US Unwired marketing PCS service to high credit risk consumers. Piper was also privy to the Company's finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Piper participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and Securities and Exchange Commission ("SEC") filings. For FY:00, FY:01, and FY:02, US Unwired paid defendant Piper $286,916, $601,317 and $298,769, respectively, in salary, bonus and other compensation, and granted him 81,022, 100,000 and 150,000 options to purchase US Unwired stock, respectively. During the Relevant Period, Piper sold 74,200 shares of US Unwired stock for proceeds of $940,475. Piper is a citizen of Louisiana.

12.     Defendant William L. Henning, Jr. ("Henning, Jr.") is, and at all times relevant hereto was, Chairman of the Board of Directors of US Unwired. Because of Henning, Jr.'s position, he knew the adverse non-public information about the business of US Unwired, specifically that the increased subscriptions for PCS service that the Company reported throughout the Relevant Period were experiencing high involuntary disconnection rates. This was due in part to US Unwired

- 3 -

marketing PCS service to high credit risk consumers. Henning, Jr. was also privy to the Company's finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board of Directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Henning, Jr. participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. For FY:00, FY:01, and FY:02, US Unwired paid defendant Henning, Jr. $320,615, $337,700 and $220,000, respectively, in salary, bonus and other compensation, and granted him 155,114, 20,000 and 20,000 options to purchase US Unwired stock, respectively. During the Relevant Period, Henning, Jr. sold 359,600 shares of US Unwired stock for proceeds of $3,711,465. Henning, Jr. is a citizen of Louisiana.

13. Defendant Jerry E. Vaughn ("Vaughn") is, and at all times relevant hereto was, the Chief Financial Officer of US Unwired. Because of Vaughn's position, he knew the adverse non-public information about the business of US Unwired, specifically that the increased subscriptions for PCS service that the Company reported throughout the Relevant Period were experiencing high involuntary disconnection rates. This was due in part to US Unwired marketing PCS service to high credit risk consumers. Vaughn was also privy to the Company's finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the Relevant Period, Vaughn participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. For FY:00, FY:01, and FY:02, US Unwired paid defendant Vaughn $227,558, $406,561 and $221,165, respectively, in salary, bonus and other compensation, and granted him 263,965, 50,000 and 75,000 options to purchase US Unwired stock, respectively. During the Relevant Period, Vaughn sold 26,000 shares of US Unwired stock for proceeds of $318,080. Vaughn is a citizen of Louisiana.

14.     Defendant Lawrence C. Tucker ("Tucker") is, and at all times relevant hereto was, a director of US Unwired. Because of Tucker's position, he knew the adverse non-public information about the business of US Unwired, specifically that the increased subscriptions for PCS service that the Company reported throughout the Relevant Period were experiencing high involuntary disconnection rates. This was due in part to US Unwired marketing PCS service to high credit risk consumers. Tucker was also privy to the Company's finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board of Directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Tucker participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Tucker is a citizen of Connecticut.

15.     Defendant Thomas G. Henning ("Thomas Henning") is, and at all times relevant hereto was, Secretary, General Counsel and a director of US Unwired. Because of Thomas Henning's positions, he knew the adverse non-public information about the business of US Unwired, specifically that the increased subscriptions for PCS service that the Company reported throughout the Relevant Period were experiencing high involuntary disconnection rates. This was due in part to US Unwired marketing PCS service to high credit risk consumers. Thomas Henning was also privy to the Company's finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board of Directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Thomas Henning participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. For FY:00, FY:01 and FY:02, US Unwired paid defendant Thomas Henning $186,567, $317,138 and $161,561, respectively, in salary, bonus and other compensation and granted him 64,498, 35,000 and 50,000 options to purchase US Unwired stock, respectively. During the Relevant Period, Thomas Henning sold 315,450 shares of US Unwired stock for proceeds of $3,348,044. Thomas Henning is a citizen of Louisiana.

- 5 -

16.     Defendant Henry P. Hebert, Jr. ("Hebert") is a director of US Unwired and has been since June of 2000. Because of Hebert's position, he knew the adverse non-public information about the business of US Unwired, specifically that the increased subscriptions for PCS service that the Company reported throughout the Relevant Period were experiencing high involuntary disconnection rates. This was due in part to US Unwired marketing PCS service to high credit risk consumers. Hebert was also privy to the Company's finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board of Directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Hebert participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Hebert is a citizen of Louisiana.

17.     Defendant Harley Ruppert ("Ruppert") is a director of US Unwired and has been since April 2002. Because of Ruppert's position, he knew the adverse non-public information about the business of US Unwired, specifically that the increased subscriptions for PCS service that the Company reported throughout the Relevant Period were experiencing high involuntary disconnection rates. This was due in part to US Unwired marketing PCS service to high credit risk consumers. Ruppert was also privy to the Company's finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board of Directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Ruppert participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Ruppert is a citizen of New York.

18.     Defendant Thomas J. Sullivan ("Sullivan") is a director of US Unwired and has been since April 2002. Because of Sullivan's position, he knew the adverse non-public information about the business of US Unwired, specifically that the increased subscriptions for PCS service that the Company reported throughout the Relevant Period were experiencing high involuntary disconnection rates. This was due in part to US Unwired marketing PCS service to high credit risk consumers.

Sullivan was also privy to the Company's finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board of Directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Sullivan participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Sullivan is a citizen of Pennsylvania.

19.     Defendant Christopher J. Stadler  ("Stadler") is a director of US Unwired and has been since April 2002. Because of Stadler's position, he knew the adverse non-public information about the business of US Unwired, specifically that the increased subscriptions for PCS service that the Company reported throughout the Relevant Period were experiencing high involuntary disconnection rates. This was due in part to US Unwired marketing PCS service to high credit risk consumers. Stadler was also privy to the Company's finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board of Directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Stadler participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Stadler is a citizen of New Jersey.

20.     Defendant Charles T. Cannada ("Cannada") was a director of US Unwired at times relevant hereto. Because of Cannada's position, he knew the adverse non-public information about the business of US Unwired, specifically that the increased subscriptions for PCS service that the Company reported throughout the Relevant Period were experiencing high involuntary disconnection rates. This was due in part to US Unwired marketing PCS service to high credit risk consumers. Cannada was also privy to the Company's finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board of Directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant

Period, Cannada participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Cannada is a citizen of Mississippi.

21.     Defendant Andrew C. Cowen ("Cowen") was a director of US Unwired at all times relevant hereto until April 2002. Because of Cowen's position, he knew the adverse non-public information about the business of US Unwired, specifically that the increased subscriptions for PCS service that the Company reported throughout the Relevant Period were experiencing high involuntary disconnection rates. This was due in part to US Unwired marketing PCS service to high credit risk consumers. Cowen was also privy to the Company's finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board of Directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Cowen participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Cowen is a citizen of New York.

22.     Defendant William L. Henning ("Henning") was a director of US Unwired at all times relevant hereto until April 2002. Because of Henning's position, he knew the adverse non-public information about the business of US Unwired, specifically that the increased subscriptions for PCS service that the Company reported throughout the Relevant Period were experiencing high involuntary disconnection rates. This was due in part to US Unwired marketing PCS service to high credit risk consumers. Henning was also privy to the Company's finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board of Directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Henning participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. During the Relevant Period, Henning sold 194,000 shares of US Unwired stock for proceeds of $2,112,330. Henning is a citizen of Louisiana.

23.     Defendant John A. Henning ("John Henning") was a director of US Unwired at all times relevant hereto until April 2002. Because of John Henning's position, he knew the adverse non-public information about the business of US Unwired, specifically that the increased subscriptions for PCS service that the Company reported throughout the Relevant Period were experiencing high involuntary disconnection rates. This was due in part to US Unwired marketing PCS service to high credit risk consumers. John Henning was also privy to the Company's finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board of Directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, John Henning participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. During the Relevant Period, John Henning sold 271,750 shares of US Unwired stock for proceeds of $2,753,080.20. John Henning is a citizen of Louisiana.

24.     The defendants identified in ¶¶11-23 are referred to herein as the "Director Defendants." The defendants identified in ¶¶11, 13, 15 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶11-13, 15, 22-23 are referred to herein as the "Insider Selling Defendants." Collectively, the Director Defendants, the Officer Defendants and the Insider Selling Defendants are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

25.     By reason of their positions as officers, directors and/or fiduciaries of US Unwired and because of their ability to control the business and corporate affairs of US Unwired, the Individual Defendants owed US Unwired and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage US Unwired in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of US Unwired and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

26.     Each director and officer of the Company owes to US Unwired and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the

- 9 -

Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

27. The Individual Defendants, because of their positions of control and authority as directors and/or officers of US Unwired, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with US Unwired, each of the Individual Defendants had access to adverse non-public information about the financial condition, operations, and improper representations of US Unwired.

28. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of US Unwired, and was at all times acting within the course and scope of such agency.

29. To discharge their duties, the officers and directors of US Unwired were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of US Unwired were required to, among other things:

(a) refrain from acting upon material inside corporate information to benefit themselves;

(b) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(c) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the

- 10 -

Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(e)     remain informed as to how US Unwired conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

(f)     ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

30.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of US Unwired, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the Individual Defendants who were also officers and/or directors of the Company during the Relevant Period has been ratified by the remaining Individual Defendants who collectively comprised all of US Unwired's Board during the Relevant Period.

31.     The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause or by themselves causing the Company to misrepresent its financial results and prospects, as detailed herein *infra*, and by failing to prevent the Individual Defendants from taking such illegal actions.  In addition, as a result of defendants' illegal actions and course of conduct during the Relevant Period, the Company is now the subject of several class action law suits that allege violations of federal securities laws.  As a result, US Unwired has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

- 11 -

(a)     Costs incurred to carry out internal investigations, including legal fees paid to outside counsel; and

(b)     Costs incurred in investigating and defending US Unwired and certain officers in the class actions, plus potentially millions of dollars in settlements or to satisfy an adverse judgment.

32.     Moreover, these actions have irreparably damaged US Unwired's corporate image and goodwill.  For at least the foreseeable future, US Unwired will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that US Unwired's ability to raise equity capital or debt on favorable terms in the future is now impaired.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

33.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

34.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was improperly misrepresenting its financial results, in order to allow defendants to artificially inflate the price of the Company's shares; (ii) maintain the Individual Defendants' executive and directorial positions at US Unwired and the profits, power and prestige that the Individual Defendants enjoyed as a result of these positions; and  (iii) deceive the investing public, including shareholders of US Unwired, regarding the Individual Defendants' management of US Unwired's operations, the Company's financial health and stability, and future business prospects, specifically related to the Company's financials that had been misrepresented by defendants throughout the Relevant Period.  In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

35.     The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct commencing by at least May 2000 and continuing until August 2002. During this time the Individual Defendants caused the Company to conceal the true fact that US Unwired was misrepresenting its financial results. In addition, defendants also made other specific, false statements about US Unwired's financial performance and future business prospects, as alleged herein.

36.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment; to conceal adverse information concerning the Company's operations, financial condition and future business prospects; and to artificially inflate the price of US Unwired common stock so they could: (i) dispose of over $13 million of their personally held stock; (ii) protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof; and (iii) use the artificially inflated Company stock to acquire companies in stock-for-stock transactions.

37.     The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently misrepresent its financial results. Because the actions described herein occurred under the authority of the Board of Directors, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

38.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## BACKGROUND

39.     Nominal defendant US Unwired, holds direct or indirect ownership interests in five Sprint PCS affiliates: Louisiana Unwired, Texas Unwired, Georgia PCS, IWO Holdings and Gulf Coast Wireless. Through Louisiana Unwired, Texas Unwired, Georgia PCS and IWO Holding, US Unwired is authorized to build, operate, and manage wireless mobility communications network products and services under the Sprint brand name in 67 markets, which currently serve over 500,000 PCS customers. US Unwired's PCS territory includes portions of Alabama, Arkansas, Florida, Georgia, Louisiana, Mississippi, Oklahoma, Tennessee, Texas, Massachusetts, New Hampshire, New York, Pennsylvania, and Vermont. In addition, US Unwired provides cellular and paging service in southwest Louisiana.

40.     On April 4, 2000, the Individual Defendants caused the Company to file a registration statement on Form S-1 with the SEC for the sale to the public of 8,000,000 shares of its class A common stock ("Initial Public Offering" or "IPO"). The registration statement became effective on May 17, 2000, and 8,000,000 shares were issued on May 23, 2000, the first day of the Relevant Period, at the price of $11.00 per share before the underwriting discount. The underwriters had the option to purchase up to an additional 1.2 million shares from selling stockholders at the same price of $11.00 per share before the underwriting discount. This registration statement was signed by defendants Piper, Henning, Jr., Henning, Thomas Henning and Vaughn.

41.     Subsequently, the underwriters exercised a portion of their "over allotment option" and, on September 12, 2000, purchased 236,700 shares. The Company received net proceeds of $80.6 million after an underwriting discount of $6.2 million and expenses of $1.2 million.

42.     According to the registration statements filed with the SEC on April 4, 2000, the expected proceeds from this offering were to be used to accelerate the construction of the Company's PCS network and for other general corporate purposes. In these filings, the Company defined its relationship with Sprint PCS as follows:

Our Affiliation with Sprint PCS

> Under our agreements with Sprint PCS, we market Sprint PCS products and services in our service area using licenses that Sprint PCS acquired from the FCC in

1994 and 1996. We will be the only provider of Sprint PCS products and services in our service area. Some key points about these agreements are:

> - each agreement lasts 50 years with an initial period of 20 years and three automatic, successive 10-year renewal periods.
> - each agreement requires revenue sharing of 8% to Sprint PCS and 92% to US Unwired, except that US Unwired retains 100% of revenues from non-US Unwired Sprint PCS customers traveling in our service area, extraordinary income and equipment sales.
> - if we terminate or breach the agreements, we may be required to sell our PCS business and network to Sprint PCS or to purchase the Sprint PCS licenses from Sprint PCS.
> - if Sprint PCS terminates or breaches the agreements, we may be able to sell our PCS business and network to Sprint PCS or to purchase the Sprint PCS licenses from Sprint PCS.

> We believe that our service area is important to Sprint PCS's plan to expand its PCS network. To date, Sprint PCS has made considerable investments in the licenses covering our service area. We estimate that Sprint PCS paid over $100 million to acquire the PCS licenses in our service area and to prepare the licensed markets for service.

The Individual Defendants caused the Company to also provide the following warnings regarding its customer base:

> Our PCS business may suffer because more subscribers generally disconnect their service in the PCS industry than in the cellular industry.

> The PCS industry has experienced a higher rate of subscribers who disconnect their service than the cellular industry. This rate, or churn, of PCS subscribers may be the result of limited network coverage, unreliable performance of calls, costs, customer care or other competitive factors.

> We plan to keep our PCS subscriber churn down by expanding network coverage, improving network reliability, marketing affordable plans and enhancing customer care. We cannot assure you that these strategies will be successful. A high rate of PCS subscriber churn could harm our competitive position and the results of operations of our PCS services.

## IMPROPER STATEMENTS

43. On August 9, 2000, the Individual Defendants caused the Company to issue a press release announcing record second quarter revenues for the period ended June 30, 2000. The Individual Defendants caused the Company to report that second quarter revenues were $25.6 million. This represented a 77% increase over the second quarter 1999. Total wireless subscribers had reached 132,000, up 62% over the second quarter of 1999. PCS subscribers had grown to 77,000 and generated $15.9 million in revenue for the quarter. Defendant Piper, commenting on the results, stated: "We had a very productive second quarter. Operationally, we launched Sprint PCS

service in nine new markets and added 109 cell sites to the network. Our sales team brought 11,000 new PCS subscribers onto the system. Financially, we executed a successful public offering during a very difficult market."

44.     On August 11, 2000, the Individual Defendants caused US Unwired to file with the SEC its Form 10-Q for the period ended June 30, 2000. In the Form 10-Q, the Individual Defendants caused US Unwired to repeat the financial results reported in the August 9, 2000 press release detailed above. The Form 10-Q was signed by defendant Vaughn. All this good news had a positive impact on US Unwired's reputation within the financial community. Jennifer A. Murtaugh ("Murtaugh") an analyst with First Union Securities, Inc. reiterated a "Strong Buy" recommendation in her August 10, 2000 report on US Unwired. This report was published shortly after the Company filed its second quarter 2000 earnings results with the SEC. Murtaugh appeared particularly persuaded by "the strong net additions and continued network deployment."

45.     On November 9, 2000, the Individual Defendants caused US Unwired to issue a press release announcing record third quarter revenues for the period ended September 30, 2000. For the third quarter, the Individual Defendants caused the Company to report record revenue of $29.3 million. This represented a 100% increase over third quarter 1999 revenues. The Company ended the third quarter with 144,000 customers, up 72% over the third quarter of 1999. PCS subscribers had grown to 91,000 and generated $20.2 million in total revenue for the quarter, a 27% increase over the second quarter of 2000. Defendant Piper, commenting on the results, stated in pertinent part:

The seasonality of the third quarter usually makes it the most challenging of the year for US Unwired, but we executed our business plan and exceeded analysts' expectations for the period. We launched Sprint's all-digital, all PCS service in eight new markets, added 145 cell sites to our network and brought 14,500 new Sprint PCS subscribers onto the system. We also laid the foundation for a strong holiday selling season by more than doubling our points of sale.

46.     On November 13, 2000, the Individual Defendants caused US Unwired to file with the SEC its Form 10-Q for the period ended September 30, 2000. In the Form 10-Q, the Individual Defendants caused US Unwired to repeat the financial results reported in the November 9, 2000 press release detailed above. The 10-Q was signed by defendant Vaughn.

47.    A review of calendar year 2000 demonstrates how the Individual Defendants caused the Company to "set the table" for 2001. Fresh off its IPO, the Individual Defendants caused the Company to quickly attribute its expanding customer base to its affiliation with Sprint PCS. Meanwhile, the Insider Selling Defendants were preparing to sell off thousands of shares reaping millions of dollars in profits.

48.    On January 2, 2001, the Individual Defendants caused US Unwired to announce in a press release that the Company had sold 127 of its towers to SBA Communications Corporation, for gross proceeds of approximately $40 million. Commenting on this announcement, defendant Piper stated:

> The strong level of interest we have received in our tower portfolio serves as an important indicator as to the attractiveness and strategic importance of our service territory. The sale of our tower assets provides us with $40 million in additional cash, further enhancing the liquidity of our already fully-funded balance sheet in a time of difficult capital market conditions.

49.    On January 17, 2001, the Individual Defendants caused US Unwired to issue a press release with the headline "US Unwired Announces Strong Fourth Quarter Subscriber Growth; Launches Eight Markets." Therein, the Company reported strong subscriber growth. During the fourth quarter, the Company added 34,909 new PCS subscribers, which accounted for a surge in its subscriber base to 126,006. The Individual Defendants caused US Unwired to further report that blended customer churn was 3.0 percent, while churn for the post-pay customers was 1.8 percent. With respect to US Unwired's expansion efforts, the Individual Defendants caused the Company to announce that it recently launched advanced Sprint PCS services in eight markets: Columbus, Greenville, Hattiesburg, Laurel, McComb, and Tupelo, Mississippi and Florence and Gadsden, Alabama. As a result, US Unwired now offered Sprint PCS Products and Services to 740,000 residents in those areas. Including these new markets, US Unwired serves 36 markets covering a population of approximately 6.0 million. Commenting on the Company's expansion efforts, defendant Piper stated: "'US Unwired employees did a fantastic job in continuing to accelerate the expansion of our customer base, ... [and][w]e began preparations for the holiday season early in the third quarter when we doubled our distribution points. We also supplemented our sales efforts by

launching markets between New Orleans and Atlanta via Interstates 59 and 20, providing coverage of Sprint's all-digital, all PCS wireless service.'"

50.     On February 22, 2001, the Individual Defendants caused US Unwired to issue a press release announcing record revenue of $35.9 million for the fourth quarter ended December 31, 2000. This represented a 22% increase over third quarter 2000 revenues. For the fiscal year 2000, US Unwired's revenues were $113.1 million, a 93% increase over the prior year. In the press release, the Individual Defendants caused the Company to attribute the results to its relationship with Sprint PCS:

> The company's growth was led by its PCS operations, which accounted for 67%, or $76.2 million, of its annual revenues.
>
> PCS subscribers grew by 35,000 to a total of 126,000 and generated $27.4 million in total revenue for the quarter, a 36% increase over the third quarter of 2000. PCS subscriber revenue was $15.2 million for the fourth quarter of 2000, up 27% from the previous quarter; and was $45.1 million for the full year, representing an increase of 337% over 1999....
>
> During 2000, US Unwired initiated Sprint PCS service in 26 markets with a total population of 6.7 million. The company currently serves 36 markets with a population of 9.3 million while its network covers approximately 6.0 million residents. As of December 31, 2000, US Unwired marketed its services through 27 company stores and more than 760 national outlets, regional retailers and local agents.

Obviously pleased with the announced results, defendant Piper stated: "'During 2000, we exceeded all the growth components of our business model. Our increases in subscribers and revenues were well above expectations. We added 495 cell sites and two switches to our PCS network, bringing Sprint PCS service to an additional 3.9 million people on schedule and on budget. We also completed two major financial transactions that raised $127.8 million in cash.'"

51.     On March 26, 2001, the Individual Defendants caused US Unwired to file with the SEC its Form 10-K Annual Report for 2000. The Form 10-K was signed by defendants Piper, Vaughn, Henning, Jr., Henning, Thomas Henning, Tucker, Cowen, Cannada and Hebert and reiterated the financial results previously distributed by the Company.

52.     On May 7, 2001, the Individual Defendants caused US Unwired to issue a press release announcing record quarterly PCS net subscriber additions of 46,423, topping the net PCS additions posted in the fourth quarter of 2000 by 33%. The Company's total wireless subscribers

base had grown to over 219,000 by March 31, 2001. The Individual Defendants also caused the

Company to report 2001 first quarter record revenue of $47.9 million. This represented a 33%

increase over fourth quarter 2000 revenues. Overall PCS subscribers had grown to 172,429 and

generated $39.5 million in total revenue for the quarter, this represented a 44% increase over the

prior quarter. Defendant Piper stated the following: "'We were pleased with our performance during

the first quarter as we improved on fourth quarter 2000's net PCS additions by over 11,500. In

addition, we reduced our monthly PCS churn rate and improved all per-subscriber PCS revenue

metrics.... We also reinforced the Sprint PCS presence in our markets as we opened four new Sprint

PCS stores in our service territory.'"

53.     Just over three weeks later, on May 24, 2001, the Individual Defendants caused US

Unwired to announce, via a press release, that defendant Henning, Jr., together with other members

of the Henning family, had initiated a structured diversification plan to sell a limited portion of their

US Unwired stock holdings at specified prices and over a one-year period. According to the press

release, the plans adopted under the new SEC rule 10b5-1 were designed to:

> avoid any real or perceived conflicts of interest that might arise from their
> involvement with the company, while enabling these founding family members to
> diversify their respective holdings and to pay certain taxes that have become due as
> a result of estate planning activities.
>
>      The plans, which provide for daily sales subject to specified daily volume
> limits and price requirements, will help to avoid a bunching of sales during US
> Unwired's "trading window" periods following quarterly announcements of US
> Unwired earnings.

Defendant Henning, Jr. went on to say:

>      "These sales plans represent a diversification and liquidity step for certain
> Henning family members.... The value of our retained US Unwired shares will
> continue to represent a substantial portion of the Henning family's personal net
> worth, reflecting our continued confidence in the success of and prospects for US
> Unwired."

54.     On August 8, 2001, the Individual Defendants caused US Unwired to announce in

a press release, another quarter of record growth capped by the Company achievement of positive

earnings before interest, taxes, depreciation, amortization and non-cash compensation ("EBITDA").

Revenues for the quarter ended on June 30, 2001 had increased to $58.7 million. This represented

a sequential increase of 23% over the first quarter of 2001, and a 129% gain over the second quarter

2000. Defendant Piper, commenting on the results, stated: "'Reaching the EBITDA-positive mark ahead of expectations is an extraordinary accomplishment.... Our outstanding operational performance and adherence to the sound fundamentals of our business plan over the last two years positioned us for the early achievement of positive EBITDA.'" Moreover, defendant Piper added: "'Our network is judged by our customers every day and is the key to our operational success. Over the next 18 months, we plan to expand our network to cover an additional one million residents, bringing our coverage up to approximately 75%.'" The Individual Defendants caused the Company to further report:

> US Unwired's rapid increase in its PCS subscriber base as well as its commitment to decreasing customer acquisition costs also significantly impacted its achieving EBITDA profitability. In the second quarter of 2001, PCS subscribers grew by 28,430 to 200,859, doubling the customer base in just 215 days. Subscriber acquisition costs remained below $350 for the second consecutive quarter, falling to $340 from $348 in the first quarter. Total wireless subscribers topped 241,500.

Defendant Piper also noted:

> an important measure of customer satisfaction with the company's Sprint PCS products is monthly a verage m inutes o f u se, w hich w as 5 44 p er a verage P CS subscriber with roaming and 402 without roaming for the quarter. Total PCS system minutes of use grew to approximately 304.6 million for the quarter, including 79.7 million roaming minutes. PCS churn, net of 30-day returns, was approximately 3.0% for the second quarter of 2001.

55.     Also on August 8, 2001, the Individual Defendants caused US Unwired to file with the SEC its Form 10-Q for the period ended June 30, 2001. The Form l0-Q was signed by defendant Vaughn. In this filing, the Individual Defendants caused US Unwired to reiterate the financial results reported in the August, 8 2001 press release detailed above.

56.     On November 8, 2001, the Individual Defendants caused US Unwired to announce in a press release its financial results for the third quarter, period ended September 30, 2001. According to the press release, this was the Company's twelfth quarter of record revenue and its second consecutive quarter of positive EBITDA. The press release stated in part:

> The company generated $1.4 million in EBITDA, excluding non-cash stock compensation expense during the third quarter, up from $1.1 million a quarter ago and a negative $5.0 million for the third quarter of 2000. In the third quarter of 2001, PCS subscribers grew by 35,107 to 235,966 and total wireless subscribers were 273,044.

Defendant Piper commented as follows:

"Our continued focus on operations was an important element in re-affirming our status as an EBITDA-positive company during the third quarter.... Despite higher than expected sales and higher than normal operating costs associated with our conversion to Sprint PCS' customer care and billing systems, our EBITDA increased. We were determined to retain our status as the profitability leader among our peer group and did so through proactive cost management and in-depth planning."

The press release went on to say:

The Company's commitment to cost containment was also demonstrated in its low cost per gross subscriber addition. PCS subscriber acquisition cost was below $350 for the third consecutive quarter, remaining at $340, the same amount reported in the second quarter and down from $348 in the first quarter. As the result of cost-conscious efforts, PCS pre-marketing cash flow exceeded $19 million or approximately $29 per average subscriber. Cash cost per subscriber remained low at $60 per subscriber.

57.    Also on November 8, 2001, the Individual Defendants caused US Unwired to file with the SEC its Form 10-Q for the period ended September 30, 2001. The Form 10-Q was signed by defendant Vaughn. In this filing, the Individual Defendants caused US Unwired to reiterate the financial results reported in the November 8, 2001 press release detailed above. However, this was not just a typical filling. During the quarter, the the Individual Defendants caused the Company to make significant changes in its accounting methods. With respect to the its accounting changes, the Individual Defendants caused the Company to state:

Changes in Accounting Estimate

Effective July 1, 2001, the Company revised its estimated lives for certain depreciable assets that resulted in a $4.6 million reduction in depreciation expense for the three months ended September 30, 2001. The estimated lives of network switch equipment was increased from five to seven years, cell site towers from five to 10 years and related cell site equipment from five to seven years. The Company revised these estimates after considering the impact of certain upgrades to its network that management believes extends the useful lives of these assets.

Effective July 1, 2001, the Company revised its estimated lives for deferred activation fee revenue and deferred activation expense in accordance with its internal policy of conducting this review annually in the third quarter. As a result of this review, the Company has revised the estimated customer life from 30 months to 15-24 months. This change resulted in an increase during the quarter in recognition of deferred activation revenue of approximately $750,000 and an increase in recognition of deferred activation expense of approximately $750,000. The Company defers activation expense only to the extent of the deferred activation fee revenues. It is the Company's policy to defer both revenue for activation fees and the direct expense of acquiring the customer in equal amounts and amortize these amounts on a straight-line basis over the estimated customer life.

58.     The changes in the Company's accounting methods caused by the Individual Defendants:

(a)     allowed the Individual Defendants to cause the Company to change the depreciation rate from five to seven years; this acts as a hedge against anticipated accelerating future expenses and helps the Company offset costs over a longer period of time, which is important if management believes they are about to experience an overall decline in total subscriptions and a decline in subscription growth; and

(b)     allowed the Company to more quickly recognize deferred customer revenues related to activation fees; this also allowed the Company to immediately offset operating cost, which is important if the Company does not believe their current customers will live up to expectations and complete their service contracts with the Company.

59.     The cumulative effect of these accounting changes was further explained by the Individual Defendants in the Company's Form 10-Q filed with the SEC on February 1, 2002:

Operating loss

The operating loss was $12.0 million for the three-month period ended September 30, 2001 as compared to $17.3 million for the three-month period ended September 30, 2000, representing a decrease of $5.3 million. The operating loss for the three-month period ended September 30, 2001 was reduced by a change in accounting estimate effective July 2001 that increased the useful lives of certain capitalized assets and reduced depreciation expense by $4.6 million.

60.     It should be noted that during the third quarter, as the Individual Defendants caused the Company to initiate these accounting changes to help offset losses in the short term, defendants Henning, Jr., Henning, Thomas Henning and John Henning sold a considerable amount of their personal holdings in US Unwired.

61.     US Unwired ended the year on a high note. On December 20, 2001, the Individual Defendants caused the Company to announce in a press release that it had entered into a definitive merger agreement with IWO Holdings, Inc. ("IWO Holdings") another Sprint PCS affiliate. Under the terms of the agreement, US Unwired would acquire all of the outstanding shares of IWO Holdings and would issue approximately 45.9 million shares common stock with an aggregate

market value of $459 million. This value was based on US Unwired's closing stock price of $10.00 on December 19, 2001.

62.     The shopping spree continued early in 2002. On February 11, 2002, the Individual Defendants caused US Unwired to announce in a press r elease t hat it had signed a definitive agreement to acquire another Sprint PCS affiliate, Georgia PCS Management, L.L.C. ("Georgia PCS"). At the time, the transaction was valued at approximately $90.4 million. Under the terms of the agreement, US Unwired would issue 5.5 million shares of class A common stock. This value was based on US Unwired's closing stock price of $6.49 on February 8, 2002, the shares had an aggregate market value of $35.7 million.

63.     On March 5, 2002, the Individual Defendants caused US Unwired to announce in a press release its fourth quarter and year-end results for the period ended December 31, 2001. The the Individual Defendants caused the Company to report that revenues for the fourth quarter had increased to $81.2 million, up $9.9 million over the third quarter of 2001. Revenue for the full year 2001 was $259.2 million. This represented a 129% improvement over 2000.

64.     Also on March 5, 2002, the Individual Defendants caused US Unwired to file with the SEC its Form 10-K Annual Report for 2001. The Form 10-K was signed by defendants Piper, Vaughn, Henning, Jr., Henning, Thomas Henning, Tucker, Cowen, Cannada and Hebert results for its fiscal year 2001.

65.     On March 15, 2002, the Individual Defendants caused US Unwired to announce in a press release that it had completed the acquisition of Georgia PCS. In the process, the Individual Defendants caused US Unwired to issue 5,395,615 shares of class A common stock and repaid $55.0 million of Georgia PCS' indebtedness.

66.     On April 2, 2002, the Individual Defendants caused US Unwired to announce that it had completed the acquisition of IWO Holdings. Under the terms of the transaction, US Unwired issued approximately 39.0 million shares of US Unwired common stock to the shareholders of IWO Holdings and had reserved approximately 6.9 million additional shares for issuance upon the exercise of IWO Holdings options and warrants. As a result of the transaction, IWO Holdings was now wholly owned by US Unwired's subsidiary, Louisiana Unwired, LLC.

67.     Shortly thereafter, the Individual Defendants caused the Company to tout the merits

of these recent acquisitions.  On May 9, 2002, the Individual Defendants caused US Unwired to

issue a press release announcing record revenue of $92.1 million for the first quarter ended March

31, 2002. The press release stated in pertinent part:

> PCS subscribers increased 103% to 350,296 from the same quarter 2001. During the
> quarter, US Unwired completed the acquisition of Georgia PCS and on April 1,
> 2002, US Unwired completed the acquisition of IWO Holdings, Inc., a Sprint PCS
> Network Partner whose service territory includes portions of New York, New
> Hampshire, Vermont and Massachusetts. These transactions create a company with
> a combined service territory of 17.6 million people, network coverage of over 12.1
> million people, and more than 550,000 total wireless subscribers.

Defendant Piper stated as follows:

> "Our continued focus on operational excellence was clearly illustrated by
> outstanding performance during the first quarter. During this period, our operational
> achievements included gross subscriber additions that exceeded those of the holiday
> selling season, average revenue per subscriber that increased in the face of
> intensifying price pressure, and network performance that improved even as system
> minutes of use increased by 35%.... Our enthusiasm for our newest properties has
> only intensified as we execute our plan to integrate the companies. The service
> territories of both IWO Holdings and Georgia PCS represent substantial potential for
> our company."

The press release went on to say:

> PCS operations generated $85.2 million in total revenue for the quarter, a
> 116% increase over the first quarter of 2001 and a 16% increase over the fourth
> quarter of 2001. PCS subscriber revenue and roaming revenue were $52.7 million
> and $27.8 million, respectively, for the first quarter of 2002 compared with $22.3
> million and $12.8 million, respectively, in the first quarter of 2001. Average monthly
> revenue per PCS subscriber (ARPU), including roaming, was $87 for the quarter, a
> $9 increase over that of the first quarter last year.

68.     Also on May 9, 2002, the Individual Defendants caused US Unwired to file with the

SEC its Form 10-Q for the period ended March 31, 2002. The Form 10-Q was signed by defendant

Vaughn, and reiterated the financial results reported in the May 9, 2002 press release described

above.

## REASONS THE STATEMENTS WERE IMPROPER

69.     The statements contained herein were each materially false and misleading when

made because they failed to disclose and/or misrepresented the following adverse facts, among

others: (1) the Company was increasing its subscriber base by signing up high credit risk customers;

(2) that accounting changes implemented by the Company were done in order to conceal the

Company's d eclining r evenues; (3) that the C ompany h ad b een e xperiencing h igh i nvoluntary disconnections related to its high credit risk customers; (4) that the Company experienced lower subscription growth as a result of its policy that required credit-challenged customers to pay substantial deposits upon the initiation of services; and (5) that the Company was engaged in a dispute with Sprint PCS regarding its business relationship with Sprint PCS and Sprint PCS was pressuring the Company.

70.     On August 13, 2002, the Individual Defendants caused US Unwired to announce in a press release the financial results for the second quarter ended June 30, 2002. Initially, the Individual Defendants caused the Company to highlight its return to positive EBITDA. However, defendant Piper went on to say:

> "Historically, demand for new wireless services has been weak in our markets during the second quarter. This year, that softness was compounded as we curtailed demand by requiring a deposit from credit-challenged customers in our southern markets and experienced high involuntary disconnects in our sub-prime credit classes."

71.     Additionally, the Individual Defendants caused the Company to file its Form 10-Q with the SEC on August 13, 2002, to state: "Churn was 3.4% for the three-month period ended June 30, 2002 as compared to 2.2% for the three-month period ended June 30, 2001. The increase is due to adding a higher number of credit challenged subscribers in 2002 that elected voluntarily to not continue using our service or that were involuntarily terminated from using our service because of non-payment."

72.     In response to this string of negative announcements, on August 13, 2002, the price of US Unwired common stock closed at $.90 per share, down 94.8% from its Relevant Period high of $17.25 per share.

73.     As a result of the Individual Defendants' actions, US Unwired's market capitalization has been damaged by over $900 million. At the same time that the defendants were causing US Unwired to suffer such devastation of its market capitalization, the Insider Selling Defendants fared much better by selling over $13 million of their personally held stock.

## ILLEGAL INSIDER SELLING

74. While in possession of the undisclosed material adverse information, the Insider Selling Defendants sold the following shares of US Unwired stock:

| Name | Date | Shares | Price | Proceeds |
|------|------|--------|-------|----------|
| Robert W. Piper | 11/12/2001 | 9000 | $ 11.80 | $ 106,200.00 |
| | 11/13/2001 | 9000 | $ 12.02 | $ 108,180.00 |
| | 11/13/2001 | 2100 | $ 12.30 | $ 25,830.00 |
| | 11/14/2001 | 4500 | $ 12.15 | $ 54,675.00 |
| | 11/14/2001 | 4500 | $ 12.20 | $ 54,900.00 |
| | 11/14/2001 | 4500 | $ 12.35 | $ 55,575.00 |
| | 11/15/2001 | 4500 | $ 12.10 | $ 54,450.00 |
| | 11/15/2001 | 4500 | $ 12.25 | $ 55,125.00 |
| | 11/16/2001 | 100 | $ 11.90 | $ 1,190.00 |
| | 11/16/2001 | 9000 | $ 11.66 | $ 104,940.00 |
| | 11/19/2001 | 4500 | $ 11.92 | $ 52,380.00 |
| | 11/19/2001 | 4500 | $ 11.64 | $ 53,730.00 |
| | 11/19/2001 | 4500 | $ 11.94 | $ 106,650.00 |
| | 11/20/2001 | 9000 | $ 11.85 | $ 106,650.00 |
| | | 74200 | | $ 940,475.00 |
| Jerry E. Vaughn | 11/13/2001 | 5000 | $ 12.40 | $ 62,000.00 |
| | 11/13/2001 | 5000 | $ 12.07 | $ 60,350.00 |
| | 11/13/2001 | 5000 | $ 12.20 | $ 61,000.00 |
| | 11/14/2001 | 5000 | $ 12.25 | $ 61,250.00 |
| | 11/14/2001 | 2000 | $ 12.35 | $ 24,700.00 |
| | 11/15/2001 | 2000 | $ 12.09 | $ 24,180.00 |
| | 11/15/2001 | 2000 | $ 12.30 | $ 24,600.00 |
| | | 26000 | | $ 318,080.00 |
| Thomas G. Henning | 7/2/2001 | 4000 | $ 10.13 | $ 40,520.00 |
| | 7/3/2001 | 3000 | $ 9.83 | $ 29,490.00 |
| | 7/5/2001 | 3000 | $ 9.66 | $ 28,980.00 |
| | 7/6/2001 | 3000 | $ 9.66 | $ 28,980.00 |
| | 7/9/2001 | 4000 | $ 9.90 | $ 39,600.00 |
| | 7/10/2001 | 4000 | $ 10.07 | $ 40,280.00 |
| | 7/11/2001 | 3000 | $ 9.55 | $ 28,650.00 |
| | 7/12/2001 | 4000 | $ 9.89 | $ 39,560.00 |
| | 7/13/2001 | 4000 | $ 10.01 | $ 40,040.00 |
| | 7/16/2001 | 4000 | $ 10.53 | $ 42,120.00 |
| | 7/17/2001 | 4000 | $ 10.51 | $ 42,040.00 |
| | 7/18/2001 | 4000 | $ 10.48 | $ 41,920.00 |
| | 7/19/2001 | 4000 | $ 10.26 | $ 41,040.00 |
| | 7/20/2001 | 4000 | $ 9.90 | $ 39,600.00 |
| | 7/23/2001 | 4000 | $ 10.43 | $ 41,720.00 |
| | 7/24/2001 | 4000 | $ 10.15 | $ 40,600.00 |
| | 7/25/2001 | 4000 | $ 10.06 | $ 40,240.00 |
| | 7/26/2001 | 4000 | $ 10.23 | $ 40,920.00 |
| | 7/27/2001 | 4000 | $ 10.25 | $ 41,000.00 |
| | 7/30/2001 | 4000 | $ 9.99 | $ 39,960.00 |
| | 7/31/2001 | 4000 | $ 10.28 | $ 41,120.00 |

| | | | | |
|---|---|---|---|---|
| 8/1/2001 | 4000 | $ 10.44 | $ | 41,760.00 |
| 8/2/2001 | 4000 | $ 10.19 | $ | 40,760.00 |
| 8/3/2001 | 4000 | $ 10.21 | $ | 40,840.00 |
| 8/6/2001 | 4000 | $ 10.20 | $ | 40,800.00 |
| 8/6/2001 | 4000 | $ 10.27 | $ | 41,080.00 |
| 8/8/2001 | 4000 | $ 10.25 | $ | 41,000.00 |
| 8/9/2001 | 4000 | $ 10.64 | $ | 42,560.00 |
| 8/10/2001 | 4000 | $ 10.75 | $ | 43,000.00 |
| 8/13/2001 | 4000 | $ 10.71 | $ | 42,840.00 |
| 8/14/2001 | 4000 | $ 10.80 | $ | 43,200.00 |
| 8/15/2001 | 4000 | $ 10.84 | $ | 43,360.00 |
| 8/16/2001 | 3450 | $ 10.82 | $ | 37,329.00 |
| 8/22/2001 | 4000 | $ 10.93 | $ | 43,720.00 |
| 8/23/2001 | 4000 | $ 10.29 | $ | 41,160.00 |
| 8/24/2001 | 3000 | $ 9.73 | $ | 29,190.00 |
| 8/27/2001 | 3000 | $ 9.39 | $ | 28,170.00 |
| 8/28/2001 | 3000 | $ 9.77 | $ | 29,310.00 |
| 8/29/2001 | 4000 | $ 9.74 | $ | 38,960.00 |
| 8/30/2001 | 4000 | $ 10.26 | $ | 41,040.00 |
| 8/31/2001 | 4000 | $ 10.80 | $ | 43,200.00 |
| 9/4/2001 | 4000 | $ 11.04 | $ | 44,160.00 |
| 9/5/2001 | 4000 | $ 10.52 | $ | 42,080.00 |
| 9/6/2001 | 3000 | $ 9.91 | $ | 29,730.00 |
| 9/7/2001 | 4000 | $ 9.89 | $ | 39,560.00 |
| 9/10/2001 | 3000 | $ 9.54 | $ | 28,620.00 |
| 9/17/2001 | 3000 | $ 9.14 | $ | 27,420.00 |
| 9/18/2001 | 3000 | $ 9.69 | $ | 29,070.00 |
| 9/19/2001 | 3000 | $ 9.75 | $ | 29,250.00 |
| 9/20/2001 | 3000 | $ 9.83 | $ | 29,490.00 |
| 9/21/2001 | 3000 | $ 9.17 | $ | 27,510.00 |
| 9/24/2001 | 3000 | $ 9.46 | $ | 28,380.00 |
| 9/25/2001 | 4000 | $ . 9.78 | $ | 39,120.00 |
| 9/26/2001 | 3500 | $ 10.35 | $ | 36,225.00 |
| 9/27/2001 | 4000 | $ 9.60 | $ | 38,400.00 |
| 9/28/2001 | 4000 | $ 10.02 | $ | 40,080.00 |
| 10/1/2001 | 4000 | $ 9.94 | $ | 39,760.00 |
| 10/2/2001 | 4000 | $ 9.97 | $ | 39,880.00 |
| 10/3/2001 | 4000 | $ 10.29 | $ | 41,160.00 |
| 10/4/2001 | 4000 | $ 10.72 | $ | 42,880.00 |
| 10/5/2001 | 4000 | $ 10.61 | $ | 42,440.00 |
| 10/8/2001 | 4000 | $ 10.48 | $ | 41,920.00 |
| 10/9/2001 | 4000 | $ 10.39 | $ | 41,560.00 |
| 10/10/2001 | 4000 | $ 10.96 | $ | 43,840.00 |
| 10/11/2001 | 4000 | $ 11.75 | $ | 47,000.00 |
| 10/12/2001 | 4000 | $ 12.21 | $ | 48,840.00 |
| 10/15/2001 | 4000 | $ 12.35 | $ | 49,400.00 |
| 10/16/2001 | 4000 | $ 13.11 | $ | 52,440.00 |
| 10/17/2001 | 4000 | $ 13.17 | $ | 52,680.00 |
| 10/18/2001 | 4000 | $ 13.07 | $ | 52,280.00 |
| 10/19/2001 | 4000 | $ 12.39 | $ | 49,560.00 |
| 10/22/2001 | 4000 | $ 12.35 | $ | 49,400.00 |
| 10/23/2001 | 4000 | $ 12.07 | $ | 48,280.00 |
| 10/24/2001 | 4000 | $ 11.82 | $ | 47,280.00 |

|  | | | | | |
|---|---|---|---|---|---|
| | 10/25/2001 | 4000 | $ | 11.98 | $ | 47,920.00 |
| | 10/26/2001 | 4000 | $ | 12.54 | $ | 50,160.00 |
| | 10/29/2001 | 4000 | $ | 12.24 | $ | 48,960.00 |
| | 10/30/2001 | 4000 | $ | 11.94 | $ | 47,760.00 |
| | 10/31/2001 | 4000 | $ | 12.19 | $ | 48,760.00 |
| | 11/19/2001 | 3000 | $ | 11.65 | $ | 34,950.00 |
| | 11/20/2001 | 3000 | $ | 11.06 | $ | 33,180.00 |
| | 11/21/2001 | 2000 | $ | 10.29 | $ | 20,580.00 |
| | 11/23/2001 | 2000 | $ | 10.63 | $ | 21,260.00 |
| | 11/26/2001 | 2000 | $ | 10.75 | $ | 21,500.00 |
| | 11/27/2001 | 2000 | $ | 10.58 | $ | 21,160.00 |
| | 4/19/2002 | 250 | $ | 7.00 | $ | 1,750.00 |
| | 4/24/2002 | 250 | $ | 7.00 | $ | 1,750.00 |
| | 4/25/2002 | 250 | $ | 7.00 | $ | 1,750.00 |
| | 4/26/2002 | 250 | $ | 7.00 | $ | 1,750.00 |
| | 5/9/2002 | 250 | $ | 7.00 | $ | 1,750.00 |
| | 5/10/2002 | 250 | $ | 7.00 | $ | 1,750.00 |
| | | 315450 | | | $ | 3,348,044.00 |
| William Henning, Jr. | 6/5/2001 | 2000 | $ | 8.21 | $ | 16,420.00 |
| | 6/6/2001 | 2000 | $ | 8.15 | $ | 16,300.00 |
| | 6/7/2001 | 2000 | $ | 8.00 | $ | 16,000.00 |
| | 6/8/2001 | 1000 | $ | 7.84 | $ | 7,840.00 |
| | 6/8/2001 | 2000 | $ | 8.06 | $ | 16,120.00 |
| | 6/11/2001 | 2000 | $ | 8.28 | $ | 16,560.00 |
| | 6/12/2001 | 2000 | $ | 8.20 | $ | 16,400.00 |
| | 6/13/2001 | 2000 | $ | 8.11 | $ | 16,220.00 |
| | 6/14/2001 | 2000 | $ | 8.15 | $ | 16,300.00 |
| | 6/15/2001 | 2000 | $ | 8.25 | $ | 16,500.00 |
| | 6/18/2001 | 2000 | $ | 8.35 | $ | 16,700.00 |
| | 6/19/2001 | 2000 | $ | 8.52 | $ | 17,040.00 |
| | 6/20/2001 | 1000 | $ | 7.75 | $ | 7,750.00 |
| | 6/20/2001 | 2000 | $ | 8.01 | $ | 16,020.00 |
| | 6/21/2001 | 2000 | $ | 8.30 | $ | 16,600.00 |
| | 6/22/2001 | 2000 | $ | 8.62 | $ | 17,240.00 |
| | 6/25/2001 | 2000 | $ | 8.85 | $ | 17,700.00 |
| | 6/26/2001 | 2000 | $ | 8.80 | $ | 17,600.00 |
| | 6/26/2001 | 2000 | $ | 9.05 | $ | 18,100.00 |
| | 6/27/2001 | 1000 | $ | 10.12 | $ | 10,120.00 |
| | 6/27/2001 | 3000 | $ | 9.50 | $ | 28,500.00 |
| | 6/28/2001 | 3000 | $ | 9.58 | $ | 28,740.00 |
| | 6/29/2001 | 4000 | $ | 10.01 | $ | 40,040.00 |
| | 7/2/2001 | 4000 | $ | 10.13 | $ | 40,520.00 |
| | 7/3/2001 | 3000 | $ | 9.83 | $ | 29,490.00 |
| | 7/5/2001 | 3000 | $ | 9.66 | $ | 28,980.00 |
| | 7/6/2001 | 3000 | $ | 9.66 | $ | 28,980.00 |
| | 7/9/2001 | 4000 | $ | 9.90 | $ | 39,600.00 |
| | 7/10/2001 | 4000 | $ | 10.07 | $ | 40,280.00 |
| | 7/11/2001 | 3000 | $ | 9.55 | $ | 28,650.00 |
| | 7/12/2001 | 4000 | $ | 9.89 | $ | 39,560.00 |
| | 7/13/2001 | 4000 | $ | 10.01 | $ | 40,040.00 |
| | 7/16/2001 | 4000 | $ | 10.53 | $ | 42,120.00 |
| | 7/17/2001 | 4000 | $ | 10.51 | $ | 42,040.00 |

| | | | | |
|---|---|---|---|---|
| 7/18/2001 | 4000 | $ 10.48 | $ | 41,920.00 |
| 7/19/2001 | 4000 | $ 10.26 | $ | 41,040.00 |
| 7/20/2001 | 4000 | $ 9.90 | $ | 39,600.00 |
| 7/23/2001 | 4000 | $ 10.43 | $ | 41,720.00 |
| 7/24/2001 | 4000 | $ 10.15 | $ | 40,600.00 |
| 7/25/2001 | 4000 | $ 10.06 | $ | 40,240.00 |
| 7/26/2001 | 4000 | $ 10.23 | $ | 40,920.00 |
| 7/27/2001 | 4000 | $ 10.25 | $ | 41,000.00 |
| 7/30/2001 | 4000 | $ 9.94 | $ | 39,760.00 |
| 7/31/2001 | 4000 | $ 10.28 | $ | 41,120.00 |
| 8/1/2001 | 4000 | $ 10.44 | $ | 41,760.00 |
| 8/2/2001 | 4000 | $ 10.19 | $ | 40,760.00 |
| 8/3/2001 | 4000 | $ 10.21 | $ | 40,840.00 |
| 8/6/2001 | 4000 | $ 10.20 | $ | 40,800.00 |
| 8/7/2001 | 4000 | $ 10.27 | $ | 41,080.00 |
| 8/8/2001 | 4000 | $ 10.25 | $ | 41,000.00 |
| 8/9/2001 | 4000 | $ 10.64 | $ | 42,560.00 |
| 8/10/2001 | 4000 | $ 10.75 | $ | 43,000.00 |
| 8/13/2001 | 4000 | $ 10.71 | $ | 42,840.00 |
| 8/14/2001 | 4000 | $ 10.80 | $ | 43,200.00 |
| 8/15/2001 | 4000 | $ 10.84 | $ | 43,360.00 |
| 8/16/2001 | 3450 | $ 10.82 | $ | 37,329.00 |
| 8/22/2001 | 4000 | $ 10.93 | $ | 43,720.00 |
| 8/23/2001 | 4000 | $ 10.29 | $ | 41,160.00 |
| 8/24/2001 | 3000 | $ 9.73 | $ | 29,190.00 |
| 8/27/2001 | 3000 | $ 9.39 | $ | 28,170.00 |
| 8/28/2001 | 3000 | $ 9.77 | $ | 29,310.00 |
| 8/29/2001 | 4000 | $ 9.74 | $ | 38,960.00 |
| 8/30/2001 | 4000 | $ 10.26 | $ | 41,040.00 |
| 8/31/2001 | 4000 | $ 10.80 | $ | 43,200.00 |
| 9/4/2001 | 4000 | $ 11.04 | $ | 44,160.00 |
| 9/5/2001 | 4000 | $ 10.52 | $ | 42,080.00 |
| 9/6/2001 | 3000 | $ 9.91 | $ | 29,730.00 |
| 9/7/2001 | 4000 | $ 9.89 | $ | 39,560.00 |
| 9/10/2001 | 3000 | $ 9.54 | $ | 28,620.00 |
| 9/17/2001 | 3000 | $ 9.14 | $ | 27,420.00 |
| 9/18/2001 | 3000 | $ 9.69 | $ | 29,070.00 |
| 9/19/2001 | 3000 | $ 9.75 | $ | 29,250.00 |
| 9/20/2001 | 3000 | $ 9.83 | $ | 29,490.00 |
| 9/21/2001 | 3000 | $ 9.17 | $ | 27,510.00 |
| 9/24/2001 | 3000 | $ 9.46 | $ | 28,380.00 |
| 9/25/2001 | 4000 | $ 9.78 | $ | 39,120.00 |
| 9/26/2001 | 3500 | $ 10.35 | $ | 36,225.00 |
| 9/27/2001 | 4000 | $ 9.60 | $ | 38,400.00 |
| 9/28/2001 | 4000 | $ 10.02 | $ | 40,080.00 |
| 10/1/2001 | 4000 | $ 9.94 | $ | 39,760.00 |
| 10/2/2001 | 4000 | $ 9.97 | $ | 39,880.00 |
| 10/3/2001 | 4000 | $ 10.29 | $ | 41,160.00 |
| 10/4/2001 | 4000 | $ 10.72 | $ | 42,880.00 |
| 10/5/2001 | 4000 | $ 10.61 | $ | 42,440.00 |
| 10/8/2001 | 4000 | $ 10.48 | $ | 41,920.00 |
| 10/9/2001 | 4000 | $ 10.39 | $ | 41,560.00 |
| 10/10/2001 | 4000 | $ 10.96 | $ | 43,840.00 |

| | | | | | |
|---|---|---|---|---|---|
| 10/11/2001 | 4000 | $ | 11.75 | $ | 47,000.00 |
| 10/12/2001 | 4000 | $ | 12.21 | $ | 48,840.00 |
| 10/15/2001 | 4000 | $ | 12.35 | $ | 49,400.00 |
| 10/16/2001 | 4000 | $ | 13.11 | $ | 52,440.00 |
| 10/17/2001 | 4000 | $ | 13.17 | $ | 52,680.00 |
| 10/18/2001 | 4000 | $ | 13.07 | $ | 52,280.00 |
| 10/19/2001 | 4000 | $ | 12.39 | $ | 49,560.00 |
| 10/22/2001 | 4000 | $ | 12.35 | $ | 49,400.00 |
| 10/23/2001 | 4000 | $ | 12.07 | $ | 48,280.00 |
| 10/24/2001 | 4000 | $ | 11.82 | $ | 47,280.00 |
| 10/25/2001 | 4000 | $ | 11.98 | $ | 47,920.00 |
| 10/26/2001 | 4000 | $ | 12.54 | $ | 50,160.00 |
| 10/29/2001 | 4000 | $ | 12.24 | $ | 48,960.00 |
| 10/30/2001 | 4000 | $ | 11.94 | $ | 47,760.00 |
| 10/31/2001 | 4000 | $ | 12.19 | $ | 48,760.00 |
| 11/19/2001 | 3000 | $ | 11.67 | $ | 35,010.00 |
| 11/20/2001 | 3000 | $ | 11.55 | $ | 34,650.00 |
| 11/21/2001 | 500 | $ | 10.52 | $ | 5,260.00 |
| 11/23/2001 | 500 | $ | 10.63 | $ | 5,315.00 |
| 11/26/2001 | 500 | $ | 10.69 | $ | 5,345.00 |
| 11/27/2001 | 500 | $ | 10.44 | $ | 5,220.00 |
| 5/1/2002 | 250 | $ | 6.30 | $ | 1,575.00 |
| 5/2/2002 | 250 | $ | 6.49 | $ | 1,622.50 |
| 5/3/2002 | 250 | $ | 6.39 | $ | 1,597.50 |
| 5/6/2002 | 250 | $ | 6.12 | $ | 1,530.00 |
| 5/7/2002 | 250 | $ | 6.38 | $ | 1,595.00 |
| 5/8/2002 | 250 | $ | 6.78 | $ | 1,695.00 |
| 5/9/2002 | 250 | $ | 6.75 | $ | 1,687.50 |
| 5/10/2002 | 750 | $ | 7.10 | $ | 5,325.00 |
| 5/13/2002 | 250 | $ | 6.37 | $ | 1,592.50 |
| 5/14/2002 | 250 | $ | 6.00 | $ | 1,500.00 |
| 5/15/2002 | 250 | $ | 6.00 | $ | 1,500.00 |
| 5/16/2002 | 250 | $ | 6.00 | $ | 1,500.00 |
| 5/17/2002 | 250 | $ | 6.18 | $ | 1,545.00 |
| 5/20/2002 | 100 | $ | 5.95 | $ | 595.00 |
| 5/21/2002 | 100 | $ | 5.42 | $ | 542.00 |
| 5/22/2002 | 100 | $ | 5.70 | $ | 570.00 |
| 5/23/2002 | 100 | $ | 5.22 | $ | 522.00 |
| 5/24/2002 | 100 | $ | 5.51 | $ | 551.00 |
| 5/30/2002 | 100 | $ | 5.18 | $ | 518.00 |
| 5/31/2002 | 100 | $ | 5.34 | $ | 534.00 |
| 6/3/2002 | 100 | $ | 5.13 | $ | 513.00 |
| 6/4/2002 | 100 | $ | 5.31 | $ | 531.00 |
| | **359600** | | | **$** | **3,711,465.00** |
| | | | | | |
| William Henning | 6/8/2001 | 2000 | $ | 7.84 | $ 15,680.00 |
| | 6/20/2001 | 2000 | $ | 7.75 | $ 15,500.00 |
| | 9/4/2001 | 5000 | $ | 11.04 | $ 55,200.00 |
| | 9/5/2001 | 5000 | $ | 10.52 | $ 52,600.00 |
| | 9/6/2001 | 5000 | $ | 9.91 | $ 49,550.00 |
| | 9/7/2001 | 5000 | $ | 9.89 | $ 49,450.00 |
| | 9/10/2001 | 5000 | $ | 9.54 | $ 47,700.00 |
| | 9/17/2001 | 5000 | $ | 9.14 | $ 45,700.00 |

- 30 -

|  |  | | | | |
|---|---|---|---|---|---|
| | 9/18/2001 | 5000 | $ | 9.69 | $ | 48,450.00 |
| | 9/19/2001 | 5000 | $ | 9.75 | $ | 48,750.00 |
| | 9/20/2001 | 5000 | $ | 9.83 | $ | 49,150.00 |
| | 9/21/2001 | 5000 | $ | 9.17 | $ | 45,850.00 |
| | 9/24/2001 | 5000 | $ | 9.46 | $ | 47,300.00 |
| | 9/25/2001 | 5000 | $ | 9.78 | $ | 48,900.00 |
| | 9/26/2001 | 5000 | $ | 10.35 | $ | 51,750.00 |
| | 9/27/2001 | 5000 | $ | 9.60 | $ | 48,000.00 |
| | 9/28/2001 | 5000 | $ | 10.02 | $ | 50,100.00 |
| | 10/1/2001 | 5000 | $ | 9.94 | $ | 49,700.00 |
| | 10/2/2001 | 5000 | $ | 9.97 | $ | 49,850.00 |
| | 10/3/2001 | 5000 | $ | 10.29 | $ | 51,450.00 |
| | 10/4/2001 | 5000 | $ | 10.72 | $ | 53,600.00 |
| | 10/5/2001 | 5000 | $ | 10.61 | $ | 53,050.00 |
| | 10/8/2001 | 5000 | $ | 10.48 | $ | 52,400.00 |
| | 10/9/2001 | 5000 | $ | 10.39 | $ | 51,950.00 |
| | 10/10/2001 | 5000 | $ | 10.96 | $ | 54,800.00 |
| | 10/11/2001 | 5000 | $ | 11.75 | $ | 58,750.00 |
| | 10/12/2001 | 5000 | $ | 12.21 | $ | 61,050.00 |
| | 10/15/2001 | 5000 | $ | 12.35 | $ | 61,750.00 |
| | 10/16/2001 | 5000 | $ | 13.11 | $ | 65,550.00 |
| | 10/17/2001 | 5000 | $ | 13.17 | $ | 65,850.00 |
| | 10/18/2001 | 5000 | $ | 13.07 | $ | 65,350.00 |
| | 10/19/2001 | 5000 | $ | 12.39 | $ | 61,950.00 |
| | 10/22/2001 | 5000 | $ | 12.35 | $ | 61,750.00 |
| | 10/23/2001 | 5000 | $ | 12.07 | $ | 60,350.00 |
| | 10/24/2001 | 5000 | $ | 11.82 | $ | 59,100.00 |
| | 10/25/2001 | 5000 | $ | 11.98 | $ | 59,900.00 |
| | 10/26/2001 | 5000 | $ | 12.54 | $ | 62,700.00 |
| | 10/29/2001 | 5000 | $ | 12.24 | $ | 61,200.00 |
| | 10/30/2001 | 5000 | $ | 11.94 | $ | 59,700.00 |
| | 10/31/2001 | 5000 | $ | 12.19 | $ | 60,950.00 |
| | | **194000** | | | **$** | **2,112,330.00** |
| | | | | | |
| John A. Henning | 6/5/2001 | 2000 | $ | 8.21 | $ | 16,420.00 |
| | 6/6/2001 | 2000 | $ | 8.15 | $ | 16,300.00 |
| | 6/7/2001 | 2000 | $ | 8.00 | $ | 16,000.00 |
| | 6/8/2001 | 2000 | $ | 7.84 | $ | 15,680.00 |
| | 6/11/2001 | 2000 | $ | 8.28 | $ | 16,560.00 |
| | 6/12/2001 | 2000 | $ | 8.20 | $ | 16,400.00 |
| | 6/13/2001 | 2000 | $ | 8.05 | $ | 16,100.00 |
| | 6/14/2001 | 2000 | $ | 8.15 | $ | 16,300.00 |
| | 6/15/2001 | 2000 | $ | 8.25 | $ | 16,500.00 |
| | 6/18/2001 | 2000 | $ | 8.35 | $ | 16,700.00 |
| | 6/19/2001 | 2000 | $ | 8.52 | $ | 17,040.00 |
| | 6/20/2001 | 2000 | $ | 7.75 | $ | 15,500.00 |
| | 6/21/2001 | 2000 | $ | 8.30 | $ | 16,600.00 |
| | 6/22/2001 | 2000 | $ | 8.62 | $ | 17,240.00 |
| | 6/25/2001 | 2000 | $ | 8.85 | $ | 17,700.00 |
| | 6/26/2001 | 2000 | $ | 8.80 | $ | 17,600.00 |
| | 6/27/2001 | 2000 | $ | 9.50 | $ | 19,000.00 |
| | 6/28/2001 | 2000 | $ | 9.58 | $ | 19,160.00 |
| | 6/29/2001 | 2000 | $ | 10.01 | $ | 20,020.00 |

| | | | | | |
|---|---|---|---|---|---|
| 7/2/2001 | 2000 | $ | 10.13 | $ | 20,260.00 |
| 7/3/2001 | 2000 | $ | 9.83 | $ | 19,660.00 |
| 7/5/2001 | 2000 | $ | 9.66 | $ | 19,320.00 |
| 7/6/2001 | 2000 | $ | 9.66 | $ | 19,320.00 |
| 7/9/2001 | 2000 | $ | 9.90 | $ | 19,800.00 |
| 7/10/2001 | 2000 | $ | 10.07 | $ | 20,140.00 |
| 7/11/2001 | 2000 | $ | 9.55 | $ | 19,100.00 |
| 7/12/2001 | 2000 | $ | 9.89 | $ | 19,780.00 |
| 7/13/2001 | 2000 | $ | 10.01 | $ | 20,020.00 |
| 7/16/2001 | 2000 | $ | 10.53 | $ | 21,060.00 |
| 7/17/2001 | 2000 | $ | 10.51 | $ | 21,020.00 |
| 7/18/2001 | 2000 | $ | 10.48 | $ | 20,960.00 |
| 7/19/2001 | 2000 | $ | 10.26 | $ | 20,520.00 |
| 7/20/2001 | 2000 | $ | 9.90 | $ | 19,800.00 |
| 7/23/2001 | 2000 | $ | 10.43 | $ | 20,860.00 |
| 7/24/2001 | 2000 | $ | 10.15 | $ | 20,300.00 |
| 7/25/2001 | 2000 | $ | 10.06 | $ | 20,120.00 |
| 7/26/2001 | 2000 | $ | 10.23 | $ | 20,460.00 |
| 7/27/2001 | 2000 | $ | 10.25 | $ | 20,500.00 |
| 7/30/2001 | 2000 | $ | 9.94 | $ | 19,880.00 |
| 7/31/2001 | 2000 | $ | 10.28 | $ | 20,560.00 |
| 8/1/2001 | 2000 | $ | 10.44 | $ | 20,880.00 |
| 8/2/2001 | 2000 | $ | 10.19 | $ | 20,380.00 |
| 8/3/2001 | 2000 | $ | 10.21 | $ | 20,420.00 |
| 8/6/2001 | 2000 | $ | 10.20 | $ | 20,400.00 |
| 8/7/2001 | 2000 | $ | 10.27 | $ | 20,540.00 |
| 8/8/2001 | 2000 | $ | 10.25 | $ | 20,500.00 |
| 8/9/2001 | 2000 | $ | 10.64 | $ | 21,280.00 |
| 8/10/2001 | 2000 | $ | 10.75 | $ | 21,500.00 |
| 8/13/2001 | 2000 | $ | 10.71 | $ | 21,420.00 |
| 8/14/2001 | 2000 | $ | 10.80 | $ | 21,600.00 |
| 8/15/2001 | 2000 | $ | 10.84 | $ | 21,680.00 |
| 8/16/2001 | 2000 | $ | 10.82 | $ | 21,640.00 |
| 8/17/2001 | 670 | $ | 11.58 | $ | 7,758.60 |
| 8/22/2001 | 2000 | $ | 10.93 | $ | 21,860.00 |
| 8/23/2001 | 2000 | $ | 10.29 | $ | 20,580.00 |
| 8/24/2001 | 2000 | $ | 9.73 | $ | 19,460.00 |
| 8/27/2001 | 2000 | $ | 9.39 | $ | 18,780.00 |
| 8/28/2001 | 2000 | $ | 9.77 | $ | 19,540.00 |
| 8/29/2001 | 2000 | $ | 9.74 | $ | 19,480.00 |
| 8/30/2001 | 2000 | $ | 10.26 | $ | 20,520.00 |
| 8/31/2001 | 2000 | $ | 10.80 | $ | 21,600.00 |
| 9/4/2001 | 2000 | $ | 10.04 | $ | 20,080.00 |
| 9/5/2001 | 2000 | $ | 10.52 | $ | 21,040.00 |
| 9/6/2001 | 2000 | $ | 9.91 | $ | 19,820.00 |
| 9/7/2001 | 2000 | $ | 9.89 | $ | 19,780.00 |
| 9/10/2001 | 2000 | $ | 9.54 | $ | 19,080.00 |
| 9/17/2001 | 2000 | $ | 9.14 | $ | 18,280.00 |
| 9/18/2001 | 2000 | $ | 9.69 | $ | 19,380.00 |
| 9/19/2001 | 2000 | $ | 9.75 | $ | 19,500.00 |
| 9/20/2001 | 2000 | $ | 9.83 | $ | 19,660.00 |
| 9/21/2001 | 2000 | $ | 9.17 | $ | 18,340.00 |
| 9/24/2001 | 2000 | $ | 9.46 | $ | 18,920.00 |

| | | | | | |
|---|---|---|---|---|---|
| 9/25/2001 | 2000 | $ | 9.78 | $ | 19,560.00 |
| 9/26/2001 | 2000 | $ | 10.35 | $ | 20,700.00 |
| 9/27/2001 | 2000 | $ | 9.60 | $ | 19,200.00 |
| 9/28/2001 | 2000 | $ | 10.02 | $ | 20,040.00 |
| 10/1/2001 | 2000 | $ | 9.94 | $ | 19,880.00 |
| 10/2/2001 | 2000 | $ | 9.97 | $ | 19,940.00 |
| 10/3/2001 | 2000 | $ | 10.29 | $ | 20,580.00 |
| 10/4/2001 | 2000 | $ | 10.72 | $ | 21,440.00 |
| 10/5/2001 | 2000 | $ | 10.61 | $ | 21,220.00 |
| 10/8/2001 | 2000 | $ | 10.48 | $ | 20,960.00 |
| 10/9/2001 | 2000 | $ | 10.39 | $ | 20,780.00 |
| 10/10/2001 | 2000 | $ | 10.96 | $ | 21,920.00 |
| 10/11/2001 | 2000 | $ | 11.75 | $ | 23,500.00 |
| 10/12/2001 | 2000 | $ | 12.21 | $ | 24,420.00 |
| 10/15/2001 | 2000 | $ | 12.35 | $ | 24,700.00 |
| 10/16/2001 | 2000 | $ | 13.11 | $ | 26,220.00 |
| 10/17/2001 | 2000 | $ | 13.17 | $ | 26,340.00 |
| 10/18/2001 | 2000 | $ | 13.07 | $ | 26,140.00 |
| 10/19/2001 | 2000 | $ | 12.39 | $ | 24,780.00 |
| 10/22/2001 | 2000 | $ | 12.35 | $ | 24,700.00 |
| 10/23/2001 | 2000 | $ | 12.07 | $ | 24,140.00 |
| 10/24/2001 | 2000 | $ | 11.82 | $ | 23,640.00 |
| 10/25/2001 | 2000 | $ | 11.98 | $ | 23,960.00 |
| 10/26/2001 | 2000 | $ | 12.54 | $ | 25,080.00 |
| 10/29/2001 | 2000 | $ | 12.24 | $ | 24,480.00 |
| 10/30/2001 | 2000 | $ | 11.94 | $ | 23,880.00 |
| 10/31/2001 | 2000 | $ | 12.19 | $ | 24,380.00 |
| 11/19/2001 | 2000 | $ | 11.65 | $ | 23,300.00 |
| 11/20/2001 | 2000 | $ | 11.30 | $ | 22,600.00 |
| 11/21/2001 | 2000 | $ | 10.00 | $ | 20,000.00 |
| 11/23/2001 | 2000 | $ | 10.47 | $ | 20,940.00 |
| 11/26/2001 | 2000 | $ | 10.70 | $ | 21,400.00 |
| 11/27/2001 | 2000 | $ | 10.55 | $ | 21,100.00 |
| 11/28/2001 | 2000 | $ | 10.38 | $ | 20,760.00 |
| 11/29/2001 | 2000 | $ | 10.23 | $ | 20,460.00 |
| 11/30/2001 | 2000 | $ | 10.10 | $ | 20,200.00 |
| 12/3/2001 | 2000 | $ | 9.89 | $ | 19,780.00 |
| 12/4/2001 | 2000 | $ | 10.11 | $ | 20,220.00 |
| 12/5/2001 | 2000 | $ | 10.29 | $ | 20,580.00 |
| 12/6/2001 | 2000 | $ | 10.44 | $ | 20,880.00 |
| 12/7/2001 | 2000 | $ | 11.49 | $ | 22,980.00 |
| 12/10/2001 | 2000 | $ | 10.63 | $ | 21,260.00 |
| 12/11/2001 | 2000 | $ | 10.89 | $ | 21,780.00 |
| 12/12/2001 | 2000 | $ | 10.94 | $ | 21,880.00 |
| 12/13/2001 | 2000 | $ | 10.70 | $ | 21,400.00 |
| 12/14/2001 | 2000 | $ | 10.64 | $ | 21,280.00 |
| 12/17/2001 | 2000 | $ | 10.00 | $ | 20,000.00 |
| 12/18/2001 | 2000 | $ | 9.96 | $ | 19,920.00 |
| 12/19/2001 | 2000 | $ | 10.00 | $ | 20,000.00 |
| 12/20/2001 | 2000 | $ | 9.89 | $ | 19,780.00 |
| 12/21/2001 | 2000 | $ | 10.00 | $ | 20,000.00 |
| 12/24/2001 | 2000 | $ | 9.84 | $ | 19,680.00 |
| 12/26/2001 | 2000 | $ | 10.09 | $ | 20,180.00 |

| | | | | |
|---|---|---|---|---|
| 12/27/2001 | 2000 | $ 10.24 | $ | 20,480.00 |
| 12/28/2001 | 2000 | $ 10.24 | $ | 20,480.00 |
| 12/31/2001 | 1080 | $ 10.02 | $ | 10,821.60 |
| 1/2/2002 | 2000 | $ 10.15 | $ | 20,300.00 |
| 1/3/2002 | 2000 | $ 11.00 | $ | 22,000.00 |
| 1/4/2002 | 2000 | $ 10.41 | $ | 20,820.00 |
| 1/7/2002 | 2000 | $ 8.84 | $ | 17,680.00 |
| 1/8/2002 | 2000 | $ 8.04 | $ | 16,080.00 |
| 1/9/2002 | 2000 | $ 8.41 | $ | 16,820.00 |
| 1/10/2002 | 2000 | $ 8.07 | $ | 16,140.00 |
| 1/11/2002 | 2000 | $ 8.15 | $ | 16,300.00 |
| 1/14/2002 | 2000 | $ 7.13 | $ | 14,260.00 |
| | **271750** | | **$** | **2,753,080.20** |

| | | | |
|---|---|---|---|
| **Total** | **1241000** | | **$13,183,474.20** |

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

75.     Plaintiff brings this action derivatively in the right and for the benefit of US Unwired to redress injuries suffered, and to be suffered, by US Unwired as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  US Unwired is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

76.     Plaintiff will adequately and fairly represent the interests of US Unwired in enforcing and prosecuting its rights.

77.     Plaintiff is and was an owner of the stock of US Unwired during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

78.     The current Board of Directors of US Unwired consists of the following eight individuals: defendants Piper, Henning, Jr., Thomas Henning, Ruppert, Tucker, Sullivan, Hebert and Stadler.  Plaintiff has not made any demand on the present Board of Directors of US Unwired to institute this action because such a demand would be a futile, wasteful and useless act, particularly for the following reasons:

(a)     The Henning family controls and dominates the Board of Directors. With holdings of over 34% of US Unwired each of the Board members are beholden to the Henning family for their positions and will not take any action against them;

(b)     As a result of their access to and review of internal corporate documents; conversations and connections with other corporate officers, employees and directors; and attendance at management and Board meetings, each of the defendants knew the adverse non-public information r egarding t he i mproper a ccounting. W hile i n p ossession o f this material a dverse non-public information regarding the Company, the following current members of the US Unwired Board participated in the illegal insider selling:

(i)     During the Relevant Period, Piper sold 74,200 shares of US Unwired stock for proceeds of $940,475;

(ii)     During the Relevant Period, Thomas Henning sold 315,450 shares of US Unwired stock for proceeds of $3,348,044; and

(iii)     During the Relevant Period, Henning, Jr. sold 359,600 shares of US Unwired stock for proceeds of $3,711,465. Because these defendants received a personal financial benefit from the challenged insider trading transactions, these defendants are interested and any demand upon them is futile;

(c)     The C ompensation C ommittee o f t he B oard r eviews a nd d etermines t he executive compensation strategy, the compensation for the CEO and other Senior Executives, and administers stock incentive and other compensation and benefit plans. The Compensation Committee is comprised of defendants Tucker, Hebert and Stadler. As the members of the Compensation Committee singularly control the other defendants' awards, the remaining members of the Board will not institute this action against defendants Tucker, Hebert and Stadler. To do so would jeopardize each defendant's personal financial compensation. Thus, demand on defendants Piper, Henning, Jr., Thomas Henning, Ruppert and Sullivan is futile;

(d)     The principal professional occupation of defendants Piper, Thomas Henning and Henning, Jr., is their employment with US Unwired, pursuant to which they received and continue to receive substantial monetary compensations and other benefits. Accordingly, defendants

Piper, Thomas Henning and Henning, Jr. lack independence from defendants Tucker, Hebert and Stadler, defendants who are not disinterested and/or independent and who exert influence over defendants Piper, Thomas Henning and Henning, Jr.'s compensation by virtue of their positions on the Compensation Committee. This lack of independence renders defendants Piper, Thomas Henning and Henning, Jr. incapable of impartially considering a demand to commence and vigorously prosecute this action;

(e) According to US Unwired's Proxy Statement filed with the SEC, defendants Sullivan, Ruppert and Hebert were members of the Audit Committee during the Relevant Period. The Audit Committee is responsible for overseeing US Unwired's financial reporting process on behalf of the Board and reporting the results of these activities to the Board. Nonetheless, the Audit Committee recommended that the Board of Directors include the improper audited consolidated financial statements in US Unwired's Annual Report on Form 10-K for the years ended December 31, 2000, December 31, 2001 and December 31, 2002 as filed with the SEC. By such actions, defendants Sullivan, Ruppert and Hebert breached their duties by causing or allowing the improper financials described above. As a result of these defendants' breach of their duties, any demand upon them is futile;

(f) The entire US Unwired Board of Directors and senior management participated in the wrongs complained of herein. US Unwired's directors are not disinterested or independent due to the following: defendants Piper, Henning, Jr., Thomas Henning, Ruppert, Tucker, Sullivan, Hebert and Stadler served on the US Unwired Board during the Relevant Period. Pursuant to their specific duties as Board members, each was charged with the management of the Company and to conduct its business affairs. Each of the above-referenced defendants breached the fiduciary duties that they owed to US Unwired and its shareholders in that they failed to prevent and correct the improper financials. Thus, the US Unwired Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because its members are interested personally in the outcome as it is their actions that have subjected US Unwired to millions of dollars in liability for possible violations of applicable securities laws;

- 36 -

(g)     Defendants Ruppert, Stadler and Sullivan are beholden to the entire Board, as the entire Board agreed to acquire IWO Holdings and defendants Ruppert, Stadler and Sullivan personally benefitted thereby. Stadler and Sullivan had been Managing Directors of IWO Holdings, from December 1998 until April 1, 2002 when IWO Holding was acquired by US Unwired. Ruppert had been a managing Director of IWO Holdings from its inception in October of 1999, until it was acquired by US Unwired in April 2002. Pursuant to a merger agreement with IWO Holdings, it was agreed that three of US Unwired's directors would resign upon consummation of the IWO Holdings merger and be replaced with three persons nominated by representatives of IWO Holdings. Ruppert, Stadler and Sullivan were chosen by IWO Holdings in April 2002 to fill US Unwired's three vacant Board seats. Because of this transaction, defendants Ruppert, Stadler and Sullivan will not take the action requested by plaintiff herein against the remainder of the US Unwired Board;

(h)     The Individual Defendants, because of their inter-related business, professional and personal relationships, have developed debilitating conflicts of interest that prevent the Board members of the Company from taking the necessary and proper action on behalf of the Company as requested herein. In addition to the conflicts that exist as a result of their participation in the improper accounting and insider selling, as detailed herein *supra*, the majority of the Board, including the defendants listed below, are subject to the following prejudicial entanglements:

(i)     ***Ruppert, Stadler and Sullivan Are Long-Time Business Associates***:

Defendants Stadler and Sullivan were Managing Directors of IWO Holdings, since December of 1999. Defendant Ruppert was also a Managing Director director of IWO Holdings, and had been since IWO Holdings' inception in October of 1999. Because of their long-standing and entangling business and professional relationships, neither defendants Sullivan, Stadler nor Ruppert will take the action requested by plaintiff herein against one another or the remainder of the Individual Defendants;

(ii)     ***Stadler and Sullivan Are Long-Time Business Associates***:

Defendants Stadler and Sullivan also have additional business ties to one another. Defendants Stadler and Sullivan are Executives of Investcorp S.A. and have been since April 1996. Stadler and Sullivan also currently serve on the Board of Directors of Werner Holding Co. Inc. ("Werner"). Stadler has been a director at Werner since November 1997 and Sullivan has been a director at Werner since July 1999. Because of their long-standing and entangling business and professional relationships, neither defendant Stadler nor defendant Sullivan will take the action requested by plaintiff herein against one another or the remainder of the Individual Defendants;

(iii)     ***Henning, Jr. and Tucker Are Long-Time Business Associates***:

Defendant Henning, Jr. was the CEO and Chairman of the Board of Directors of Xspedius Holding Group ("Xspedius") from 1998 to 2002. Defendant Tucker is a director of Xspedius. Because of their long-standing and entangling business and professional relationships, neither defendant Henning, Jr. nor defendant Tucker will take the action requested by plaintiff herein against one another or the remainder of the Individual Defendants.

(iv)     ***Henning, Jr., Thomas Henning, John Henning and Henning Are***

***Related to One Another***:

Henning is the father of Thomas Henning, John Henning and Henning, Jr. Because of this entangling familial relationship, defendants Thomas Henning and Henning, Jr. will not will take the action requested by plaintiff herein against each other, their family members or the remainder of the Individual Defendants;

(i)     Henning, Jr., and Thomas Henning are officers and directors of Cameron Communications, LLC ("Cameron"), a limited liability company engaged primarily in the wireline communications business. Cameron is also a shareholder of Xspedius, a corporation engaged primarily in the competitive local exchange business. Henning, Jr., is the former Chairman and CEO of Xspedius. The 1818 Fund is a principal shareholder of Xspedius, and defendant Tucker is an executive of the 1818 Fund and is also a director of Xspedius. US Unwired, Cameron, Xspedius and their subsidiaries have agreements with one another and with other companies under common control as described below:

(i)     US Unwired leases office space to Xspedius, which paid US Unwired $664,000 in rent in 2003. Xspedius provides circuit and voicemail services that US Unwired uses and also resells to its cellular and digital subscribers, for which US Unwired paid Xspedius $1,732,000 in 2003;

(ii)     Cameron provides circuit and interconnect services to US Unwired and was paid $437,000 in 2003. US Unwired leases tower space from and paid Cameron $112,000 in rent in 2003. The Company also purchases long distance service from Cameron and resells that service to US Unwired customers. US Unwired paid Cameron approximately $255,000 in 2003 for long distance service;

- 38 -

(iii)      US Unwired uses, for a rate of $3.00 per air mile, a Beechraft RK-12 aircraft owned by Cameron. US Unwired paid Cameron approximately $32,000 in 2003 for these flight services; and

(iv)      Unibill, Inc. ("Unibill"), a wholly owned subsidiary of Cameron, provides bill processing and related services for US Unwired. For these services, Unibill received approximately $1,700,000 from the Company in 2003. In March 1998, US Unwired agreed to lease office, equipment and warehouse space from Unibill for 60 months. When the lease expired in March 2003 it was continued from month to month at the same rent until a new 60 month lease was executed, effective January 16, 2004. In 2003 US Unwired paid Unibill $280,000 under these leases. Because of these debilitating conflicts of interests owned by the Hennings and defendant Tucker, any demand on them is futile;

(j)      Each of the key officers and directors knew of and/or directly benefitted from the wrongdoing complained of herein;

(k)      The defendant directors of US Unwired, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from US Unwired's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties;

(l)      In order to bring this suit, all of the directors of US Unwired would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand;

(m)      The acts complained of constitute violations of the fiduciary duties owed by US Unwired's officers and directors and these acts are incapable of ratification;

(n)      Each of the defendant directors of US Unwired authorized and/or permitted the false statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the false and misleading statements and are principal beneficiaries of the wrongdoing

- 39 -

alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them;

      (o)    Any suit by the current directors of US Unwired to remedy these wrongs would likely expose the Individual Defendants and US Unwired to further violations of the securities laws that would result in civil actions being filed against one or more of the Individual Defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves;

      (p)    US Unwired has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for US Unwired any part of the damages US Unwired suffered and will suffer thereby;

      (q)    If the current directors were to bring this derivative action against themselves, they would thereby expose their own misconduct, which underlies allegations against them contained in class action complaints for violations of securities law, which admissions would impair their defense of the class actions and greatly increase the probability of their personal liability in the class actions, in an amount likely to be in excess of any insurance coverage available to the Individual Defendants.  In essence, they would be forced to take positions contrary to the defenses they will likely assert in the securities class actions.  This they will not do.  Thus, demand is futile; and

      (r)    If US Unwired's current and past officers and directors are protected against personal liability for their acts of mismanagement, abuse of control and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of US Unwired.  However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by US Unwired against these defendants, known as, *inter alia*, the "insured versus insured exclusion."  As a result, if these directors were to sue themselves or certain

of the officers of US Unwired, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. If there is no directors' and officers' liability insurance at all then the current directors will not cause US Unwired to sue them, since they will face a large uninsured liability.

79.     Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board of Directors has failed and refused to seek to recover for US Unwired for any of the wrongdoing alleged by plaintiff herein.

80.     Plaintiff has not made any demand on shareholders of US Unwired to institute this action since such demand would be a futile and useless act for the following reasons:

a.     US Unwired is a publicly held company with approximately 163 million shares outstanding, and thousands of shareholders;

b.     Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

c.     Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## COUNT ONE

### Against the Insider Selling Defendants for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information

81.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

82.     At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold US Unwired common stock on the basis of such information.

83.     The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset

belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold US Unwired common stock.

84.     At the time of their stock sales, the Insider Selling Defendants knew that the Company's revenues were materially overstated. The Insider Selling Defendants' sales of US Unwired common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

85.     Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

## COUNT TWO

## Against All Defendants for Breach of Fiduciary Duty

86.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

87.     The Individual Defendants owed and owe US Unwired fiduciary obligations. By reason of their fiduciary relationships, the Officer Defendants and Director Defendants owed and owe US Unwired the highest obligation of good faith, fair dealing, loyalty and due care.

88.     The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

89.     Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial results of the Company and failed to correct the Company's publicly reported financial results and guidance. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

90.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, US Unwired has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

91.     Plaintiff on behalf of US Unwired has no adequate remedy at law.

## COUNT THREE

### Against All Defendants for Abuse of Control

92.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

93.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence US Unwired, for which they are legally responsible.

94.     As a direct and proximate result of the Individual Defendants' abuse of control, US Unwired has sustained significant damages.

95.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

96.     Plaintiff on behalf of US Unwired has no adequate remedy at law.

## COUNT FOUR

### Against All Defendants for Gross Mismanagement

97.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

98.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of US Unwired in a manner consistent with the operations of a publicly held corporation.

99.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, US Unwired has sustained significant damages in excess of hundreds of millions of dollars.

100.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

101.    Plaintiff on behalf of US Unwired has no adequate remedy at law.

## COUNT FIVE

### Against All Defendants for Waste of Corporate Assets

102.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

103.    As a result of the improper accounting, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, defendants have caused US Unwired to waste valuable corporate assets by paying incentive based bonuses to certain of its executive officers and incur potentially millions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions.

104.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

105.    Plaintiff on behalf of US Unwired has no adequate remedy at law.

## COUNT SIX

### Against All Defendants for Unjust Enrichment

106.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

107.    By their wrongful acts and omissions, defendants were unjustly enriched at the expense of and to the detriment of US Unwired.

108.    Plaintiff, as a shareholder and representative of US Unwired, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

- 44 -

B.      Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of US Unwired has an effective remedy;

C.      Awarding to US Unwired restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the defendants;

D.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury.

LEMMON LAW FIRM, LLC


_____
ANDREW A. LEMMON (#18302)

650 Poydras Street, Suite 2335
New Orleans, LA 70130
Telephone:504.581.5644
Facsimile: 504.581.2156

ROBBINS UMEDA & FINK, LLP
BRIAN J. ROBBINS
MARC M. UMEDA
JEFFREY P. FINK
1010 Second Ave., Suite 2360
San Diego, CA  92101
Telephone:  619/525-3990
Facsimile: 619/525-3991

Attorneys for Plaintiff