**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**CLODILE ROMERO, JR.,** *et al.*                    **CIVIL ACTION**

                                                      **NO.  04-2312**
**VERSUS**                                            **C/W:  04-2436**
                                                      **REF:  ALL CASES**

**US UNWIRED, INC.,** *et al.*                        **SECTION: I/5**

<u>**ORDER AND REASONS**</u>

        Before the Court are three related motions to dismiss arising out of the above-captioned

consolidated cases.  Defendant US Unwired, Inc. ("USU"), has filed a motion to dismiss the

securities fraud class action brought on behalf of USU stockholders and represented by lead

plaintiff Billy Lormand.[1]  The USU corporate officers sued in Lormand's action, William L.

Henning, Jr., Robert W. Piper, and Jerry E. Vaughn (collectively, "individual defendants"), have

also filed a motion to dismiss Lormand's complaint.[2]  USU, the individual defendants, and

defendants Thomas G. Henning, Lawrence C. Tucker, Henry P. Herbert, Jr., Thomas J. Sullivan,

---

        [1]Rec. Doc. No. 71.

        [2]Rec. Doc. No. 76.  At times, individual defendants' instant motion refers to exhibits filed with a previous joint motion to dismiss that was dismissed as moot by the Court after Lormand was permitted to amend his complaint.  *See* Rec. Doc. No. 97; *see also* Rec. Doc. No. 79, p. 3 n.5 (noting that defendants will continue to cite to documents previously submitted).

-1-

Christopher J. Stadler, Charles T. Cannada, Andrew C. Cowen, Harley Ruppert, William L. Henning, and John A. Henning also filed a motion to dismiss the shareholder derivative action brought by plaintiff Don Feyler on behalf of USU.[3]  Considering the consolidated nature of these cases and the related facts and legal issues underlying these motions, the Court will consider defendants' motions jointly.  For the following reasons, plaintiffs' complaints are **DISMISSED**.

## *BACKGROUND*

USU was a Louisiana telecommunications corporation headquartered in Lake Charles, Louisiana.[4]  USU provided wireless mobile communication services to subscribers and was, for some time, a network partner of Sprint PCS, the personal communications group within the Sprint corporation.[5]  As a network partner, USU had the exclusive right to provide PCS services in 14 states under the Sprint PCS brand name.[6]  USU, one of the largest Sprint PCS network partners, served over 600,000 customers.[7]

Sprint PCS offered its network partners three options with varying levels of control over their respective networks.  When USU began carrying Sprint PCS products and services across its network in 1998, it chose to become a Type III affiliate, allowing USU to perform almost 100% of the service related to the operation, management, and maintenance of the service network.  USU served as a Type III affiliate from November, 1998, until August, 2001.[8]

---

[3]Rec. Doc. No. 107.

[4]Rec. Doc. No. 107, Mem., p. 3.

[5]Rec. Doc. No. 79, p. 3.

[6]PCS stands for "Personal Communication Services."  Rec. Doc. No. 71, Mem., p. 2 n.2.

[7]Rec. Doc. No. 88-2, p. 6.

[8]Rec. Doc. No. 88-2, p. 19.

In 1999, plaintiffs allege that Sprint PCS began to force USU to convert to a Type II affiliate, a move that would give Sprint PCS more control over the operations and finances of the network.  Plaintiffs complain that Sprint PCS exerted pressure on USU to agree to become a Type II affiliate when it unfairly delayed giving USU the ability to market new Sprint PCS services, including Wireless Web technology, which put USU at a serious competitive disadvantage.[9]  Despite this friction between USU and Sprint PCS, plaintiffs allege that USU misrepresented the company's relationship with Sprint PCS in an effort to produce more positive financial reports, particularly in light of USU's pending initial public offering.[10]  In September, 2000, USU agreed to convert to a Type II affiliate and began a twelve-month process to do so.[11]

As a result of this conversion, Sprint PCS gained substantial control over USU's business operations, including its billing, activation, and customer care services.[12]  This arrangement required Sprint PCS to provide collected revenue due to USU on a weekly basis, which Sprint PCS estimated using a "revenue profile."[13]

In May, 2001, Sprint PCS instituted a calling program for credit-impaired customers that did not require these high credit-risk customers to pay a deposit before becoming subscribers.[14]  Instead, these plans established spending limits for subscribers.  Sprint PCS required that USU,

---

[9]Rec. Doc. No. 92, p. 4.  Defendants contend that Sprint PCS urged USU to convert to a Type II affiliate "for the stated reason that conversion would ensure continued technical compatibility with Sprint's cutting-edge wireless web product offerings."  Rec. Doc. No. 71, p. 2.

[10]Rec. Doc. No. 92, p. 5; Rec. Doc. No. 65, p. 3.  USU went public in May, 2000.  Rec. Doc. No. 88-2, p. 23.

[11]Rec. Doc. No. 88-2, p. 30.

[12]Rec. Doc. No. 79, p. 6.

[13]Rec. Doc. No. 79, p. 6.

[14]Rec. Doc. No. 71, Mem., p. 3; Rec. Doc. No. 88-2, p. 28.

now a Type II affiliate, offer these no-deposit plans to its customers, despite the previous plans that USU offered pursuant to a more conservative credit program.  While these liberal no-deposit programs allowed USU to meet yearly subscriber goals, USU found that its "churn," or number of subscribers terminating their service in a given period,[15] increased.  In February, 2002, USU reinstated its deposit requirement to reduce churn and expenses caused by these high credit-risk customers.[16]

In July, 2003, USU filed an action against Sprint PCS in the United States District Court for the Western District of Louisiana, bringing claims against Sprint PCS for violations of RICO, breach of fiduciary duty, breach of contract, and fraud.[17]  After extensive litigation, the parties settled in July, 2005, and agreed that Sprint PCS would acquire USU in a short-form merger[18] for approximately $1.3 billion.[19]  As a result, on August 12, 2005, USU became a wholly owned subsidiary of Sprint PCS.[20]

On August 12, 2004, plaintiff, Clodile Romero, filed a securities fraud class action on behalf of purchasers of the securities of USU against USU and certain directors of the company-- the individual defendants--seeking to recover for those who purchased USU securities between

---

[15]Rec. Doc. No. 71, Mem., p. 3 n.10.

[16]Rec. Doc. No. 88-2, p. 29.

[17]Rec. Doc. No. 92, p. 10; Rec. Doc. No. 71, p. 3; Rec. Doc. No. 88, pp. 4-5.

[18]A "short-form merger" pursuant to Delaware law "enables a parent company owning at least 90% of its subsidiary to merge with the subsidiary without advance notice to or consent by minority shareholders. Under this procedure the parent company may eliminate minority shareholders of the subsidiary by making cash payments to them for their stock."  *SEC v. Blatt*, 583 F.2d 1325, 1331 (5th Cir. 1978)

[19]Rec. Doc. No. 92, p. 10.

[20]Rec. Doc. No. 65, p. 67 ¶161.

May 23, 2000, and August 13, 2002.[21]  The lead plaintiff in the case was later changed to Billy

Lormand.[22]  Lormand's second amended complaint contains claims for violations of sections

10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5

promulgated pursuant to the Exchange Act.[23]

On August 25, 2004, plaintiff, Feyler, filed a shareholder derivative action on behalf of

USU against Sprint PCS and several officers and directors of USU, including the individual

defendants.  Feyler's third amended complaint contains claims against the officers and directors

of USU for breach of fiduciary duties, abuse of control, mismanagement, waste of corporate

assets, unjust enrichment, and against Sprint PCS for aiding and abetting a breach of fiduciary

duty.[24]  On November 11, 2004, the Lormand and Feyler actions were consolidated.[25]  All parties

agree that Louisiana law applies to plaintiffs' claims, but that the Court may need to look to

Delaware law.[26]

---

[21]Rec. Doc. No. 1.

[22]Rec. Doc. No. 15.

[23]Rec. Doc. No. 65, pp. 74-79

[24]Rec. Doc. no. 88-2, pp. 73-79.

[25]Rec. Doc. No. 10.

[26]Rec. Doc. No. 45; *see also Romero v. US Unwired*, No. 04-2312, 2005 U.S. Dist. LEXIS 17741, at *10 (E.D. La. Aug. 11, 2005) (citing *Armand v. McCall*, 570 So. 2d 158, 160 (La. App. 3d Cir. 1990) (stating "the state of Delaware is recognized as a leader in the field of corporation law"))

**I.  Standard of Law:  Motion to Dismiss for Failure to State a Claim**

A district court cannot dismiss a complaint, or any part of it, for failure to state a claim upon which relief can be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99, 102, 2 L. Ed. 2d 80, 84 (1957); *Blackburn v. City of Marshall*, 42 F.3d 925, 931 (5th Cir. 1995).  This Court will not look beyond the factual allegations in the pleadings to determine whether relief should be granted.  *See Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999); *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996).  In assessing the complaint, a court must accept all well-pleaded facts in the complaint as true and liberally construe all factual allegations in the light most favorable to the plaintiff.  *Spivey,* 197 F.3d at 774; *Lowry v. Tex. A&M Univ. Sys.*, 117 F.3d 242, 247 (5th Cir. 1997).  Motions to dismiss for failure to state a claim are generally disfavored and granted only in rare circumstances.  *Mahone v. Addicks Util. Dist.*, 836 F.2d 921, 926 (5th Cir. 1988) (citing *Clark v. Amoco Prod. Co.*, 794 F.2d 967, 970 (5th Cir.1986); *Rios v. Dillman*, 499 F.2d 329, 330 (5th Cir. 1974)).

"However, 'in order to avoid dismissal for failure to state a claim, a plaintiff must plead specific facts, not mere conclusory allegations. . . .'" *Guidry v. Bank of LaPlace*, 954 F.2d 278, 281 (5th Cir. 1992) (quoting *Elliott v. Foufas*, 867 F.2d 877, 881 (5th Cir. 1989)). "'[C]onclusory allegations and unwarranted deductions of fact are not admitted as true' by a motion to dismiss." *Id.* (quoting *Associated Builders, Inc. v. Ala. Power Co.*, 505 F.2d 97, 100 (5th Cir. 1974)).  "[T]he complaint must contain either direct allegations on every material point necessary to sustain a recovery . . . or contain allegations from which an inference fairly may be drawn that evidence on these material points will be introduced at trial." *Campbell v. City of San*

*Antonio*, 43 F.3d 973, 975 (5th Cir. 1995) (internal quotation and citation omitted).  "In deciding

a motion to dismiss the court may consider documents attached to or incorporated in the

complaint and matters of which judicial notice may be taken."  *Willard v. Humana Health Plan*

*of Tex. Inc.*, 336 F.3d 375, 379 (5th Cir. 2003) (citing *Lovelace v. Software Spectrum Inc.*, 78

F.3d 1015, 1017-18 (5th Cir. 1996)).

 The Court will first address the motion to dismiss Feyler's shareholder derivative action.

## II.  Feyler's Derivative Claim--Lack of Standing

 Defendants first argue that, because Feyler is no longer a USU shareholder, he lacks

standing to bring a derivative action on behalf of USU.  Plaintiff does not appear to contest that,

by virtue of the Sprint PCS merger effected in August, 2005, that left Sprint PCS as the sole

surviving corporation, his shareholder status in USU has been terminated.  Plaintiff contends that

Louisiana law, particularly La. Rev. Stat. § 12:115(E), permits him to maintain his lawsuit even

after the merger because his lawsuit was filed before the corporate action divested plaintiff of his

shareholder status.

 Our determination of whether Feyler may proceed with his derivative action is governed

by the application of state law.  *Lewis v. Knutson*, 699 F.2d 230, 235 (5th Cir. 1983) ("[A]

substantive right in a shareholder derivative action . . . is determined according to the law of . . .

the state of . . . incorporation.") (citing *Rogers v. Guar. Trust Co. of N.Y.*, 288 U.S. 123, 53 S. Ct.

295, 77 L. Ed. 652 (1922), and *Blanchard v. Commonwealth Oil Co.*, 294 F.2d 834, 840 (5th Cir.

1961)); *see also Brister v. Schlinger Found*, No. 04-3247, 2005 U.S. Dist. LEXIS 17815, at *19

(E.D. La. Jul. 27, 2005) (Vance, J.) (citing *Atkins v. Hibernia Corp.*, 182 F.3d 320, 323 (5th Cir.

1999) ("State law determines whether, and in what manner, a shareholder may assert an action

based on a corporate officer's or director's breach of fiduciary duty.")).

In Louisiana, shareholder derivative actions are permitted to enforce a right of the corporation pursuant to La. Code Civ. Pro. art. 611 and may be brought by a plaintiff who adequately represents the members of the class.  La. Code Civ. Pro. art. 612.  The gravamen of this issue, however, concerns the requirements that a plaintiff in a shareholder derivative action must have been a shareholder of the corporation at the time of the disputed corporate action and at the time the lawsuit is brought.  *See* La. Code Civ. Pro. art. 615; *Christopher v. Liberty Oil & Gas Corp.*, 665 So. 2d 410, 411 (La. App. 1st 1995).

La. Rev. Stat. § 12:115 addresses the effect of a merger on a corporation's obligations and liabilities:

> The surviving or new business, nonprofit or foreign corporation shall be responsible for all of the liabilities and obligations of each of the business, nonprofit and foreign corporations merged or consolidated, in the same manner as if such surviving or new corporation had itself incurred such liabilities or obligations; but the liabilities of such constituent corporations or of their shareholders, members, directors or officers shall not be affected, nor shall the rights of the creditors thereof, or of any persons dealing with such corporations, be impaired by such merger or consolidation; and any claim existing, or action or proceeding pending, by or against any of such constituent corporations may be prosecuted to judgment as if such merger or consolidation had not taken place, or the surviving or new corporation may be proceeded against, or substituted, in place of such constituent corporation.

Plaintiff argues that this statute preserves his derivative action despite the loss of his shareholder status.  Defendants claim that while this statute preserves a corporation's right to maintain its pre-merger claims, § 12:115 does not permit plaintiff to maintain such claims derivatively.

The dearth of cases in Louisiana with facts similar to the instant case provides the Court with little guidance.  As defendants point out, the Louisiana courts that have addressed whether a derivative action can survive a merger have generally found that these mergers tend to divest

-8-

plaintiffs of their standing.  In *Armand v. McCall*, 570 So. 2d 158 (La. App. 3d 1990), the state appellate court reviewed a case in which the defendant's company, McCall Enterprises, effected a cash-out merger and acquired Cameron Crew Boats, a corporation in which the plaintiff was a shareholder.  After the merger, the plaintiffs sued, requesting that a state court assign a higher value for the shares of Cameron Crew Boats than was paid as a result of the merger.  *Id.* at 159. In addition to this demand, the plaintiffs also filed a derivative suit against the defendant for breach of his fiduciary duty.  *Id.* n.1.  The court agreed with the trial court's determination that the plaintiffs' demand for an increased valuation of the shares forfeited their rights as shareholders to pursue a derivative claim, citing *Lewis v. Anderson*, 477 A.2d 1040 (Del. 1984). *Id.* at 160.

The *Armand* court also addressed the plaintiffs' argument that their standing was preserved by La. Rev. Stat. § 12:115.  Instead of preserving the plaintiffs' derivative action, however, the court found that this right of action was now owned by the new corporation created by the merger, holding that § 12:115 "does not, in any sense, provide as to who shall pursue a cause of action," and that "[i]f the new corporation fails to pursue the matter to the satisfaction of its current shareholders, among which petitioners are not numbered, then the new shareholders are those to whom the right of a derivative action belongs."  *Id.* at 161.  Accordingly, the old shareholder plaintiffs were without standing to pursue their derivative claim; instead, standing was with the new corporation.  *See also Cross v. Cross Marine, Inc.*, 822 So. 2d 193, 199 (La. App. 4th 2002) (determining that where freeze-out merger was effected, the plaintiff lost his status as a shareholder and, therefore, his claims were moot); *Christopher*, 665 So. 2d at 411 (holding that, where the plaintiffs had sold their shares during the pendency of their derivative

action, they "lack[ed] a right or legal interest in the subject matter of the suit at issue").

In *Armand*, however, the merger occurred prior to the filing of plaintiff's derivative action, a distinction that at least one commentator has noted.  *See* Glenn G. Morris, *Shareholder Derivative Suits:  Louisiana Law*, 56 La. L. Rev. 583, 640 (1996) ("Louisiana courts have so far permitted an involuntary loss of standing only where the suit was commenced after the loss of the shares; they have not yet considered whether the same rule would apply where the suit had already been commenced.") (citing *Armand*).  Moreover, the *Armand* plaintiffs' loss of standing was involuntary.  While this did not factor into that court's decision, other authorities have refused to find that standing has been lost when plaintiffs involuntarily lose their shares.  *See Shelton v. Thompson*, 544 So. 2d 845, 848-49 (Ala. 1989) (holding that a merger prior to the derivative action did not abolish plaintiffs' standing and stating that to rule otherwise would permit an "actionable derivative suit against an officer of the corporation to be abated simply by effecting a merger with another corporation, as if the mere act of merger wipes out the alleged culpable conduct"); *A.L.I. Principles of Corporate Governance: Analysis and Recommendations*, § 7.02(a) (1992) (suggesting that standing be maintained where a "derivative action was commenced prior to the corporate action terminating the holder's status").

The Supreme Court of Delaware has definitively ruled, however, that where a corporate merger takes place after plaintiffs file a derivative action and divests plaintiffs of their shareholder status, plaintiffs do not have standing to continue the derivative action; instead, "upon the merger the derivative rights pass to the surviving corporation which then has the sole

right or standing to prosecute the action." *Lewis v. Ward*, 852 A.2d 896, 901 (Del. 2004).[27] Importantly, this holding exists despite a Delaware statute remarkably similar to La. Rev. Stat. § 12:115. *See* Del. Code Ann. tit. 8, § 261 ("Any action . . . pending by or against any corporation which is a party to a merger or consolidation shall be prosecuted as if such merger or consolidation had not taken place . . . .")[28]; *Lewis v. Anderson*, 477 A.2d 1040, 1044 (Del. 1984) (considering § 261).

While the Court is reluctant to apply Louisiana law with less than explicit precedent from state courts as a guide, a decision is required. Most notably, the *Armand* case speaks to the limits of § 12:115, leaving the right to pursue a derivative action to the surviving entity of a merger. Delaware courts, considered significant authorities in corporation law, also reveal well-established jurisprudence on this topic that Louisiana courts would certainly look to in deciding this case. Further, the Federal Rules of Civil Procedure also require continuous ownership throughout the pendency of a derivative suit. *See* Fed. R. Civ. P. 23.1; *Schilling v. Belcher*, 582 F.2d 995, 999 (5th Cir. 1978) ("[I]t is generally held that the ownership requirement continues throughout the life of the suit and that the action will abate if the plaintiff ceases to be a shareholder before the litigation ends.") (citation omitted). Considering these sources, the Court finds that the Sprint PCS merger divested Feyler of standing to maintain his derivative suit and,

---

[27]In *Lewis*, the Delaware court recognized two exceptions to this doctrine, finding that standing could be maintained where (1) the merger itself is subject to a claim of fraud or (2) where the merger is merely a reorganization that does not affect plaintiff's ownership in the business. *Lewis*, 852 A.2d at 902. Here, plaintiff makes no claim that either of these exceptions apply.

[28]The full text of 8 Del. C. § 261 reads:

Any action or proceeding, whether civil, criminal or administrative, pending by or against any corporation which is a party to a merger or consolidation shall be prosecuted as if such merger or consolidation had not taken place, or the corporation surviving or resulting from such merger or consolidation may be substituted in such action or proceeding.

therefore, his claims should be dismissed.

## III.  Lormand Action

Having dismissed plaintiff Feyler's claim, the Court now turns to the motions to dismiss

plaintiff Lormand's complaint.

## A.  Particularity of Plaintiff's Allegations

The PSLRA mandates a heightened pleading standard for securities law class action

complaints, requiring that a plaintiff "allege with specificity each fraudulent statement, who

made the statement, why it was false, and that the statement was made with the requisite state of

mind."[29]  *Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 255 (5th Cir. 2005) (footnote omitted).

"To state a securities-fraud claim under section 10(b), and Rule 10b-5, plaintiffs must plead (1) a

misstatement or omission; (2) of a material fact; (3) made with scienter; (4) on which the

plaintiffs relied; and (5) that proximately caused the plaintiffs' injuries."  *Id.* at 255-56 (quoting

*Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*, 365 F.3d 353, 362 (5th Cir. 2004) (citing

*Williams v. WMX Techs., Inc.*, 112 F.3d 175, 177 (5th Cir. 1997)).  Federal Rule of Civil

Procedure 9(b) also applies in securities fraud cases.  "To satisfy Rule 9(b)'s pleading

requirements, the plaintiffs must specify the statements contended to be fraudulent, identify the

---

[29]The PSLRA provides, in relevant part:

(B) . . . the complaint shall specify each statement alleged to have been misleading, the reason or
reasons why the statement is misleading, and, if an allegation regarding the statement or omission
is made on information and belief, the complaint shall state with particularity all facts on which
that belief is formed.
(2) Required state of mind. In any private action arising under this title in which the plaintiff may
recover money damages only on proof that the defendant acted with a particular state of mind, the
complaint shall, with respect to each act or omission alleged to violate this title, state with
particularity facts giving rise to a strong inference that the defendant acted with the required state
of mind.

15 U.S.C. § 78u-4.

speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Southland*, 365 F.3d at 362 (internal quotation omitted).

Individual defendants argue that plaintiff's allegations are insufficiently particular to meet the requirements of the PSLRA and Rule 9(b).[30]  Considering plaintiff's detailed, 81-page second amended complaint and without weighing the substance of plaintiff's allegations, the Court finds that plaintiff has plead his claims with sufficient particularity.

**B.  Statements Protected by PSLRA's Safe Harbor Provision**

Defendants argue that several of Lormand's allegations relate to statements that are protected by the "safe harbor" provision in the Private Securities Litigation Reform Act ("PSLRA") and that the allegations are, therefore, inactionable.[31]  Specifically, defendants cite plaintiff's allegations relating to press releases made in 2000 and 2001, defendants' SEC Form 10-Q filed in November, 2000, and a conference call held in August, 2001.[32]  Defendants' argue that they had no duty to disclose their internal opinions regarding the no-deposit plans forced on them by Sprint PCS.[33]  Plaintiff makes three counter-arguments, contending that:  (1) defendants' statements are unprotected misrepresentations concerning facts; (2) the statements were not accompanied by meaningful cautionary language; and (3) defendants are not protected by the

---

[30]Rec. Doc. No. 79, pp. 22-32.

[31]Rec. Doc. No. 79, pp. 16-21.

[32]Rec. Doc. No. 65 ¶108 (press release, Nov. 8, 2000); ¶109 (press release, Nov. 9, 2000); ¶110 (SEC Form 10-Q, Nov. 13, 2000); ¶113 (press release, Jan. 17, 2001); ¶114 (press release, Feb. 22, 2001); ¶124 (conference call, Aug. 9, 2001).  Though neither plaintiff nor defendants provided the Court with a copy of the referenced press release on November 9, 2000, or a transcript of the August 9, 2001, conference call, the Court was able to obtain and review a copy of the press release and a recording of the conference call.  Both have been placed into the record of this case.

[33]Rec. Doc. Nos. 79, p. 21.

safe harbor provision because they knew their statements were false.[34]

According to the PSLRA, a forward-looking statement is not actionable unless it is a material statement made with "actual knowledge" that it was "false or misleading." If a statement is "identified as a forward-looking statement" and is "accompanied by meaningful cautionary statements," it falls within the ambit of the PSLRA's "safe harbor" provision.[35]  15

---

[34]Rec. Doc. No. 92, pp. 47-50.

[35]The PSLRA provides, in relevant part:

(c) Safe harbor.
(1) In general. Except as provided in subsection (b), in any private action arising under this title that is based on an untrue statement of a material fact or omission of a material fact necessary to make the statement not misleading, a person referred to in subsection (a) shall not be liable with respect to any forward-looking statement, whether written or oral, if and to the extent that--
(A) the forward-looking statement is--
(i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or
(ii) immaterial . . . .
(B) the plaintiff fails to prove that the forward-looking statement--
(i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or
(ii) if made by a business entity;[,] was--
(I) made by or with the approval of an executive officer of that entity; and
(II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.
(2) Oral forward-looking statements. In the case of an oral forward-looking statement made by an issuer that is subject to the reporting requirements of section 13(a) or section 15(d), or by a person acting on behalf of such issuer, the requirement set forth in paragraph (1)(A) shall be deemed to be satisfied--
(A) if the oral forward-looking statement is accompanied by a cautionary statement--
(i) that the particular oral statement is a forward-looking statement; and
(ii) that the actual results might differ materially from those projected in the forward-looking statement; and
(B) if--
(i) the oral forward-looking statement is accompanied by an oral statement that additional information concerning factors that could cause actual results to materially differ from those in the forward-looking statement is contained in a readily available written document, or portion thereof;
(ii) the accompanying oral statement referred to in clause (i) identifies the document, or portion thereof, that contains the additional information about those factors relating to the forward-looking statement; and
(iii) the information contained in that written document is a cautionary statement that satisfies the standard established in paragraph (1)(A).

15 U.S.C. § 78u-5.

U.S.C. §§ 78u-5(c)(1)(A)-(B); *see Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 866 (5th Cir. 2003); *Tarica v. McDermott Int'l, Inc.*, No. 99-3831, 2000 U.S. Dist. LEXIS 14144, at *35 (E.D. La. Sept. 19, 2000) (Vance, J.); *see also Southland*, 365 F.3d at 371 ("The safe harbor has two independent prongs: one focusing on the defendant's cautionary statements and the other on the defendant's state of mind.") (citing 15 U.S.C. §§ 77z-2(c)(1)(A)-(B), 78u-5(c)(1)(A)-(B)). A forward-looking statement is defined as a statement containing a financial projection, "a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer," a statement of the plans for future operations, a statement of future economic performance, or "any statement of the assumptions underlying or relating to any statement described [above]." 15 U.S.C. § 78u-5(i).

Having reviewed these alleged misrepresentations, the Court finds that, as a matter of law, defendants' statements are protected by the safe harbor provision of the PSLRA. In each, defendants make forward-looking statements related to projections and plans and not to discrete facts. In addition, each statement is accompanied by cautionary language qualifying the statements by noting that they "are not guarantees of future performance . . . and involve known and unknown risks and other factors that could cause actual results to be materially different from any future results expressed or implied by them."[36] Beyond the blanket assertion by plaintiff that defendants knew that these statements were false when they were made, the Court can find no other suggestions of this alleged fraud. Lormand's opposition argues that the Court

---

[36]See Rec. Doc. No. 37, Ex. A2, p. 2 (press release, Nov. 8, 2000), Ex. A3, p. 2 (press release, Jan. 17, 2001), Ex. A4, p. 2 (press release, Feb. 22, 2001); Rec. Doc. No. 65, Ex. GG, p. 10 (SEC Form 10-Q, Nov. 13, 2000). The November 9, 2000, press release included language similar to that included in the earlier releases, and the conference call on August 9, 2001, was prefaced by the same cautionary language as that included in the March 6, 2002 call. *See* Rec. Doc. No. 37, Ex. A14, p. 3; *see also supra* note 31.

must apply a higher standard in determining whether defendants' statements are protected by the PSLRA's safe harbor provision because the issue is presented in a motion to dismiss, prior to the parties having completed discover.  *See* Rec. Doc. No. 92, p. 48 n.30 (citing *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 403 F.3d 1050, 1056-58 (9th Cir. 2005), and *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 734 (7th Cir. 2004)).  The Court finds that, as a matter of law, no reasonable juror could find that defendants' statements were not protected by the PSLRA.  For the purposes of this motion, the Court will ignore plaintiff's allegations relating to these particular statements and those allegations specifically contained in paragraphs 108-10 and 113-14 of plaintiff's second amended complaint.[37]

## C.  Loss Causation

The PSLRA also requires that a plaintiff prove "loss causation" in a securities fraud action.  15 U.S.C. §78u-4(b)(4).  Plaintiffs in such cases "have the burden of proving that the act or omission of the defendant alleged to violate this title caused the loss for which the plaintiff seeks to recover damages."  *Id.*  The United States Supreme Court has found this principle to be well-established.  *Dura Pharm., Inc., v. Broudo*, 544 U.S. 336, 343, 215 S. Ct. 1627, 1632, 161 L. Ed. 2d 577 (2005); *see also United States v. Olis*, 429 F.3d 540, 546 (5th Cir. 2005) (citing *Dura*).

To establish the requisite causation, the truth regarding a defendant's putative misrepresentations must come to light.  "[T]here is no loss attributable to a misrepresentation unless and until the truth is subsequently revealed and the price of the stock accordingly

---

[37]Because the Court finds that these statements are protected by the PSLRA's safe harbor provision, the Court does not address defendants' argument that they had no specific duty to disclose internal opinions regarding the no-deposit programs.

declines. Where the value of a security declines for other reasons, however, such decline, or component of the decline, is not a 'loss' attributable to the misrepresentation." *Olis*, 429 F.3d at 546; *see also Huddleston v. Herman & MacLean*, 640 F.2d 534, 549 (5th Cir. 1981), *rev'd in part on other grounds*, 459 U.S. 375, 103 S. Ct. 683, 74 L. Ed. 2d 548 ("The causation requirement is satisfied in a Rule 10b-5 case only if the misrepresentation touches upon the reasons for the investment's decline in value.  If the investment decision is induced by misstatements or omissions that are material and that were relied on by the claimant, but are not the proximate reason for his pecuniary loss, recovery under the Rule is not permitted.").

Both parties cite repeatedly to *Dura*.  In that case, the Supreme Court considered whether a securities fraud class action complaint had stated the necessary economic loss.  544 U.S. at 338, 215 S. Ct. at 1629.  The Dura stockholders alleged in their complaint that Dura or its officials had made false representations regarding drug sale profits and the potential approval by the Food and Drug Administration ("FDA") of Dura's new medical device.  *Id.* at 339, 215 S. Ct. at 1630.  The plaintiffs claimed that Dura's subsequent announcements that its earning would be lower than expected due to slow drug sales and that the FDA would not approve its medical device led to drops in Dura's stock price.  *Id.*  Though not specifically mentioning economic loss, the plaintiffs' allegations stated that they had paid artificially inflated prices for Dura securities and suffered damages.  *Id.* at 340, 215 S. Ct. at 1630.

The district court dismissed the complaint, finding that, with respect to the medical device claim, the plaintiffs had failed to allege loss causation; the Court of Appeals for the Ninth Circuit, however, reversed, finding that, since the complaint alleged that the stock price at the time of purchase was overstated, the plaintiffs had properly alleged loss causation.  *Id.*  The

Supreme Court found the Ninth Circuit's reasoning unsupported, holding that it was insufficient for a plaintiff to merely allege an inflated purchase price without establishing that the defendant's misrepresentation proximately caused economic loss.  *Id.* at 346, 215 S. Ct. at 1634. In so doing, the Court noted that the PSLRA "expressly imposes on plaintiffs 'the burden of proving' that the defendant's misrepresentations 'caused the loss for which plaintiff seeks to recover.'"  *Id.* at 345-46, 215 S. Ct. at 1633.

Here, Lormand has failed to detail the statements made during the class period that would have revealed the truth about defendants' alleged misrepresentations and shown these misrepresentations to be the proximate cause of plaintiff's losses.  In Lormand's complaint, he includes a section entitled "The Truth Begins to Emerge," which contains six individual statements made that allegedly revealed the truth of defendants' misrepresentations to the market.[38]  Several of these statements, however, do little to advance Lormand's arguments.  The first three of these statements refer to statements that were not made by defendants.[39]  In its next allegation, plaintiff notes that, in a press release, defendants "failed to disclose any known information about the Company's relationship with Sprint PCS or the true state of the Company's financial condition"[40]; there is no discussion, however, as to how defendants' failure to disclose information may have caused the truth regarding defendants' alleged misrepresentations to emerge.

---

[38]Rec. Doc. No. 65, pp. 61-62 ¶¶141-46.

[39]Rec. Doc. No. 65, p. 61 ¶141 (warning issued by AirGate PCS that it would not meet its previous growth forecast); Rec. Doc. No. 65, p. 61 ¶142 (analysts downgrade USU share rating); Rec. Doc. No. 65, p. 61 ¶143 (Moody's Investor Service places ratings for USU on review for possible downgrade).

[40]Rec. Doc. No. 65, p. 62 ¶144.

Plaintiff points to two statements made by USU on August 13, 2002, regarding its no-deposit customers.  In the first statement, USU explains in a press release that the typical weakness in its second quarter demand "was compounded . . . by requiring a deposit from credit-challenged customers and . . . high involuntary disconnects in our sub-prime credit classes."[41]  In the second, USU's Form 10-Q states that the company's increase in churn was "due to adding a higher number of credit challenged subscribers in 2002 that elected voluntarily to not continue using our service or that were involuntarily terminated . . . because of non-payment."[42]  Plaintiff contends that, as a result of these negative announcements, USU stock closed at $0.90 per share on August 13, 2002, down from its class period high of $17.25 per share and its close of $1.14 per share on August 12, 2002.[43]

Neither of these statements, however, appears to suggest that any of defendants' previous statements may have been misleading.  Of the myriad statements included in plaintiff's complaint, the Court can find only one made by defendants prior to their purported misrepresentations that specifically addresses the no-deposit customers.  In a March 6, 2002, conference call, defendant, Piper, discussed the no-deposit programs, explaining that:

> Those of you that have followed us over the years know we have always been a proponent to opening our network to the ClearPay customer demographic.  We think these customers are necessary to reach our full market penetration potential and we think we can do it profitably. . . . ClearPay has provided us with a great boost in subscriber additions.  Now it's time and we need to work to fine-tune the offering to control acquisition costs and reduce bad debt."[44]

---

[41]Rec. Doc. No. 65, p. 62 ¶145.

[42]Rec. Doc. No. 65, p. 62 ¶146.

[43]*See* Rec. Doc. No. 71, Def.'s Ex. L.

[44]Rec. Doc. No. 65, p. 57 ¶135.

This endorsement of the no-deposit programs, however, is not necessarily contradicted by the August 13, 2002, statements blaming these programs for USU's poor performance at that time. In particular, Piper's statement that "we need to work to fine-tune the offering to control acquisition costs and reduce bad debt" intimates that problems existed with the program and that his was a qualified endorsement. Moreover, the Court does not believe that this single statement by Piper, amid all the other allegations, is sufficient to show the requisite causation. Defendants' August 13, 2002, statements do not constitute emerging truth sufficient to show that defendants' earlier alleged misrepresentations proximately caused the drop in USU share price from $1.14 to $0.90.

Because plaintiff's complaint fails to sufficiently allege loss causation as required by the PSLRA, plaintiff's claims pursuant to § 10(b) and Rule 10b-5 must be dismissed.[45]

**D.  Section 20(a) Control Person Liability**

Lastly, defendants argue that plaintiff's claims against specific "control persons" pursuant to § 20(a) of the Exchange Act should be dismissed.[46]  Defendants note that the liability of those defined as "control persons" is derivative of a primary securities fraud claim and contend that, because plaintiff has failed to state a proper claim pursuant to § 10(b), his § 20(a) claim should be dismissed as well.  15 U.S.C. § 78t(a) provides that:

> Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of

---

[45]The Court, therefore, finds no need to address defendants' additional arguments that plaintiff has failed to sufficiently allege scienter.

[46]Rec. Doc. No. 79, pp. 44-45.

action.

A § 20(a) claim does rely on an independent securities law claim.  *See ABC Arbitrage v. Tchuruk*, 291 F.3d 336, 362 n.123 (5th Cir. 2002) (finding that "[p]laintiffs' section 20(a) control-person liability claims . . . were also properly dismissed based on [p]laintiffs' failure to plead predicate securities fraud claims under section 10(b) and Rule 10b-5"); *Lovelace v. Software Spectrum*, 78 F.3d 1015, 1021 n.8 (5th Cir. 1996) (same); *Haack v. Max Internet Communs., Inc.*, No. 00-1662, 2002 U.S. Dist. LEXIS 5652, at *29 (N.D. Tex. Apr. 2, 2002) ("A § 20(a) claim is derivative of a § 10(b) claim.").  Because the Court has found that plaintiff has failed to state a claim pursuant to § 10(b) and Rule 10b-5, plaintiff's § 20(a) claim must be dismissed as well.

Accordingly,

**IT IS ORDERED** that the motion to dismiss lead plaintiff Don Feyler's shareholder derivative action filed by defendants USU, William L. Henning, Jr., Robert W. Piper, and Jerry E. Vaughn, Thomas G. Henning, Lawrence C. Tucker, Henry P. Herbert, Jr., Thomas J. Sullivan, Christopher J. Stadler, Charles T. Cannada, Andrew C. Cowen, Harley Ruppert, William L. Henning, and John A. Henning[47] is **GRANTED**, and Feyler's complaint is **DISMISSED WITHOUT PREJUDICE**.

**IT IS FURTHER ORDERED** that the motion to dismiss lead plaintiff Billy Lormand's securities fraud class action filed by William L. Henning, Jr., Robert W. Piper, and Jerry E. Vaughn[48] is **GRANTED**, and Lormand's complaint is **DISMISSED WITHOUT PREJUDICE**.

---

[47]Rec. Doc. No. 107.

[48]Rec. Doc. No. 76.

**IT IS FURTHER ORDERED** that the motion to dismiss Lormand's complaint filed by USU[49]  is **GRANTED.**

New Orleans, Louisiana, August ___11th___, 2006.

                                    _____
                                         **LANCE M. AFRICK**
                                **UNITED STATES DISTRICT JUDGE**

---

[49]Rec. Doc. No. 71.